SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**New Jersey Division of Child Protection and Permanency v. Y.N. (A-24-13) (072804)**

**Argued September 9, 2014 -- Decided December 22, 2014**

**ALBIN, J., writing for a unanimous Court.**

The primary issue in this case is whether, under N.J.S.A. 9:6-8.21(c)(4)(b), a finding of abuse or neglect can be sustained against a woman who, while addicted to drugs, learns she is pregnant and enters a bona fide methadone treatment program, and whose child suffers methadone withdrawal symptoms at birth.

In or about September 2010, after injuring her hand in a fall, Y.N. (Yvonne)[1] went to a hospital where she learned for the first time that she was four months pregnant. Yvonne disclosed to hospital personnel that she had been taking prescription Percocet for injuries caused by a car accident several months earlier. She was informed that if she suddenly stopped taking the Percocet she might suffer withdrawal symptoms and lose her unborn baby. Yvonne secured prenatal care at Morristown Memorial Hospital where she was told that she could only stop taking Percocet through a methadone maintenance treatment program. On January 5, 2011, Yvonne enrolled in a methadone maintenance program at American Habitare & Counseling, Inc. (Habitare). Yvonne had entered detoxification programs in 2009 and 2010 for abusing prescription drugs and using cocaine and heroin.

From January 6 through March 15, 2011, Yvonne's urine screens indicated no drugs in her system other than methadone. On February 18, 2011, Yvonne gave birth to P.A.C. (Paul), who was diagnosed with neonatal abstinence syndrome as a result of his withdrawal symptoms from methadone. He was admitted into the neonatal intensive care unit where he received treatment, which included the administration of morphine, and was released to Yvonne's care on April 6, 2011.

In the morning of February 23, 2011, Paul's father, P.C. (Phil) had a hostile encounter with Yvonne and hospital personnel and threatened to take Paul from the hospital. Yvonne obtained a domestic violence temporary restraining order based on the events at the hospital and on Yvonne's allegations that Phil previously had thrown her down a set of stairs and choked her. A week afterwards, at Yvonne's request, the restraining order was dismissed. Yvonne later confessed that she lied about prior bouts of domestic violence from fear of losing Paul. As a result of the domestic violence episode in the hospital, the police referred the matter to the Division of Youth and Family Services, since renamed the Division of Child Protection and Permanency. This was the beginning of the Division's involvement with Yvonne and Paul.

On March 15, 2011, Phil called the Division, claiming that he observed Yvonne high on drugs. On March 18, when she went to Habitare, Yvonne was told she would have to submit to a random drug test. According to Yvonne, she waited fifteen minutes for the test but then had to leave because a cab whose fare she had pre-paid was outside honking its horn. She testified that she returned the next day to Habitare but was told she already had been marked down for a refusal. Habitare considered her failure to submit to the urine analysis the equivalent of a positive test result.

On April 5, 2011, the Division filed a complaint seeking care, custody, and supervision of Paul. N.J.S.A. 30:4C-12. The complaint also alleged that Yvonne abused or neglected Paul based on Yvonne's prior drug history, her refusal to take the March 18 drug test, Paul's methadone withdrawal, and the domestic violence involving Yvonne and Phil. N.J.S.A. 9:6-8.21. At the conclusion of the abuse and neglect hearing on June 29, 2011, the family court determined that the Division had proven abuse or neglect by a preponderance of the evidence.

In rendering its decision, the court made the following findings: (1) Yvonne had a long drug history dating

_____
[1] Pseudonyms are used for ease of reference.

back to 2005; (2) Yvonne became aware that she was pregnant but continued to "expose" her unborn child to drugs for another four months before her entry into the Habitare program, one month before Paul's birth; (3) Yvonne

refused to take a random drug test in March 2011 even though she was "reasonably compliant" with the program; and (4) she has the potential to expose her child to domestic violence.

Yvonne appealed the court's finding of abuse and neglect. The Appellate Division affirmed the family court's abuse and neglect finding solely on the basis that Yvonne caused her child to suffer withdrawal symptoms from the methadone she took as part of a prescribed, bona fide medical treatment plan. N.J. Div. of Youth & Family Servs. v. Y.N., 431 N.J. Super. 74, 82 (App. Div. 2013). The panel held Yvonne strictly liable for the harm suffered by Paul and gave no consideration to whether Yvonne acted unreasonably or failed to provide a minimum level of care for her newborn.

The Supreme Court granted Yvonne's petition for certification. N.J. Dep't of Children & Families v. Y.N., 216 N.J. 13 (2013). The Court also granted the motions of four parties to participate as amici curiae.

**HELD:** Absent exceptional circumstances, a finding of abuse or neglect cannot be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she has made full disclosure.

1. New Jersey's child-welfare laws balance a parent's right to raise a child against "the State's parens patriae responsibility to protect the welfare of children." N.J. Dep't. of Children and Families v. A.L., 213 N.J. 1, 17-18 (2013). One of Title Nine's primary purposes is to protect children "who have had serious injury inflicted upon them" and to safeguard them "from further injury and possible death." N.J.S.A. 9:6-8.8(a). A finding of abuse or neglect against a parent may result in significant and longstanding adverse consequences. Strict adherence to the statutory standards of N.J.S.A. 9:6-8.21(c)(4) is important because the stakes are high for all parties concerned. (pp. 18-19)

2. The plain language of N.J.S.A. 9:6-8.21(c)(4)(b) requires proof that the child was impaired or in imminent danger of becoming impaired because the parent (1) failed to exercise a minimum degree of care and (2) unreasonably inflicted or allowed to be inflicted harm, or created a substantial risk of inflicting harm, on the child. The statute makes clear that parental fault is an essential element for a finding of abuse or neglect. At the very least, a minimum degree of care means that a parent's conduct must be "grossly negligent or reckless." N.J. Dep't of Children and Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 306 (2011). N.J.S.A. 9:6-8.21(c)(4)(b) is not a strict liability statute. It does not suggest that a finding of abuse or neglect can be premised solely on a harm caused to a child without consideration of the reasonableness of the parent's conduct. Sometimes a parent may cause injury to a child to protect that child from greater harm. Under those circumstances, the parent may be acting reasonably. The Division must establish that, at a minimum, a parent acted with gross negligence or recklessness to succeed in a prosecution under N.J.S.A. 9:6-8.21(c)(4)(b). (pp. 20-25)

3. The Court rejects the Appellate Division's conclusion that "[w]here there is evidence of actual impairment, it is immaterial whether the drugs taken were from a legal or illicit source." Y.N., supra, 431 N.J. Super. at 82. The Court cannot ignore the other statutory elements of N.J.S.A. 9:6-8.21(c)(4)(b) – whether Yvonne exercised a "minimum degree of care" or "unreasonably" inflicted harm on her newborn. The reasoning of the Appellate Division creates a perverse disincentive for a pregnant woman to seek medical help and enter a bona fide detoxification treatment program that will address her and her baby's health needs. Nothing in N.J.S.A. 9:6-8.21(c)(4)(b) suggests that a woman is not exercising the minimum level of care by obtaining timely medical advice and by timely entering a medically approved detoxification program that will improve the outcome for her newborn. Absent exceptional circumstances, a finding of abuse or neglect cannot be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she has made full disclosure. (pp. 25-30)

The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** to the Appellate Division for further consideration of whether there is any alternative basis on which to sustain the family court's finding of abuse or neglect.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA and SOLOMON join in JUSTICE ALBIN's opinion; JUDGE CUFF (temporarily assigned) did not participate.**

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY

    Plaintiff-Respondent,

        v.

Y.N.,

    Defendant-Appellant,

    and

P.C.,

    Defendant.
_____
IN THE MATTER OF P.A.C., a
minor.


          Argued September 9, 2014 – Decided December 22, 2014

          On certification to the Superior Court,
          Appellate Division, whose opinion is
          reported at 431 N.J. Super. 74 (2013).

          Clara S. Licata, Designated Counsel, argued
          the cause for appellant (Joseph E. Krakora,
          Public Defender Parental Representation,
          attorney; Ms. Licata and T. Gary Mitchell,
          Deputy Public Defender, of counsel and on
          the briefs).

          Erin O'Leary, Deputy Attorney General,
          argued the cause for respondent New Jersey
          Division of Child Protection and Permanency
          (John J. Hoffman, Acting Attorney General,
          attorney; Andrea M. Silkowitz, Assistant
          Attorney General; Ms. O'Leary and Lisa J.
          Rusciano, on the briefs).

James A. Louis, Deputy Public Defender, argued the cause for respondent P.A.C. (Joseph E. Krakora, Public Defender Law Guardian, attorney; Mr. Louis, Olivia Belfatto-Crisp, Assistant Deputy Public Defender, and Lisa M. Black, Designated Counsel, on the briefs).

Lawrence S. Lustberg argued the cause for amici curiae Experts in Maternal and Fetal Health, Public Health, and Drug Treatment (Gibbons and National Advocates for Pregnant Women, attorneys; Mr. Lustberg, Lynn M. Paltrow, and Farah C. Diaz-Tello, members of the New York bar, on the briefs).

Sean Marotta argued the cause for amicus curiae Statewide Parent Advocacy Network, Inc. (Hogan Lovells US, attorneys).

Ronald K. Chen argued the cause for amici curiae American Civil Liberties Union of New Jersey and American Civil Liberties Union Foundation (Rutgers Constitutional Litigation Clinic Center for Law & Justice, Mr. Chen, Edward L. Barocas, Jeanne M. LoCicero, Alexander R. Shalom, and Alexa Kolbi-Molinas, a member of the New York bar, on the brief).

Mary M. McManus-Smith, argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., President, attorney; Ms. McManus-Smith, Mr. Miller, and Jeyanthi C. Rajaraman, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

At a routine doctor's appointment for a hand injury, Y.N. (Yvonne)[1] learned that she was four months pregnant. During that

---

[1] Pseudonyms are used for ease of reference.

four-month period, Yvonne had been taking Percocet for injuries caused in a car accident and became dependent on that medication. Hospital personnel advised her that she could not stop taking Percocet abruptly without endangering her pregnancy and recommended that she enter a methadone maintenance treatment program. Yvonne entered such a program four months later, a month before she gave birth. Her baby, P.A.C. (Paul), suffered methadone withdrawal symptoms at birth and remained hospitalized for about seven weeks.

The Division of Youth and Family Services (Division)[2] filed an abuse and neglect complaint against Yvonne based on her long-term drug use before and during her pregnancy, the harm caused to Paul from methadone withdrawal, and her failure to address acts of domestic violence committed against her. After a hearing, the family court entered a finding of abuse and neglect.

The Appellate Division affirmed solely on the basis that Yvonne caused her child to suffer withdrawal symptoms from the methadone she took as part of a prescribed, bona fide medical treatment plan. N.J. Div. of Youth & Family Servs. v. Y.N., 431 N.J. Super. 74, 82 (App. Div. 2013). The panel held her

---

[2] Effective June 29, 2012, the New Jersey Division of Youth and Family Services was renamed the Division of Child Protection and Permanency. L. 2012, c. 16, § 20.

3

strictly liable for the harm suffered by Paul and gave no consideration to whether Yvonne acted unreasonably or failed to provide a minimum level of care for her newborn.

We disagree with the Appellate Division's reasoning and now reverse. We hold that, absent exceptional circumstances, a finding of abuse or neglect cannot be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she has made full disclosure. In this case, a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b) required proof that Yvonne unreasonably inflicted harm on her newborn and did so, at least, by acting with gross negligence or recklessness. The Appellate Division looked only to the child's withdrawal symptoms at the time of his birth and not to whether his mother took reasonable steps to minimize the harm to her child by securing treatment for her addiction. In short, the Appellate Division did not consider all of the requisite statutory elements in its analysis.

We remand to the Appellate Division to determine whether the finding of abuse or neglect can be sustained on any other ground articulated by the family court.

4

The issue in this appeal arises from a June 2011 hearing before the family court at which the Division charged Yvonne with the abuse or neglect of her newborn child, Paul.  At the hearing, the Division presented two witnesses -- a Division supervisor and a Division caseworker.  The Division also introduced into evidence various medical, psychological, and investigative reports.  Yvonne testified as well.  The following three paragraphs are based on Yvonne's testimony.

In or about September 2010, after injuring her hand in a fall, she went to a hospital where she learned for the first time that she was four months pregnant.  Yvonne disclosed to hospital personnel that she had been taking prescription Percocet for injuries caused by a car accident several months earlier.  She was informed that if she suddenly stopped taking the Percocet she might suffer withdrawal symptoms and lose her unborn baby.  She was told to secure prenatal care immediately.

She received prenatal care at Morristown Memorial Hospital where she was told that she could only stop taking Percocet through a methadone maintenance treatment program.  For the next four months, Yvonne had appointments with "regular doctors and high risk doctors," received prenatal care, and searched for a detoxification clinic.  On January 5, 2011, Yvonne enrolled in a

methadone maintenance program at American Habitare & Counseling, Inc. (Habitare).

This was not her first experience in a detoxification program. In 2005, Yvonne struggled with depression after the loss of her young daughter due to illness. In the aftermath, she began abusing prescription pills and then turned to cocaine and heroin. To address her drug abuse, she entered detoxification programs in 2009 and 2010. The last time she used cocaine and heroin was about eight months before discovering she was pregnant.[3]

Yvonne's initial drug test at Habitare revealed the presence of opiates in her system. The test was consistent with her account of taking Percocet, which is an opioid drug.[4] Physicians' Desk Reference 1096-97 (65th ed. 2011). In accordance with Habitare's protocols, Yvonne began taking a daily dosage of methadone and followed her treatment plan.

From January 6, 2011, through March 15, 2011, Yvonne's urine screens indicated no drugs in her system other than methadone. On February 18, 2011, Yvonne gave birth to Paul at Morristown Memorial Hospital. Paul was diagnosed with neonatal

---

[3] In contrast, at Habitare, Yvonne disclosed that she had continued to use cocaine and heroin until about the time of Paul's conception.

[4] Other opioids are morphine and heroin. Taber's Cyclopedic Med. Dictionary 1124 (Donald Venes et al. eds., 22d ed. 2013).

abstinence syndrome as a result of his withdrawal symptoms from methadone.[5]  Those symptoms included tremors, fever, and trouble sleeping.  Paul was admitted into the neonatal intensive care unit where he received treatment, which included the administration of morphine.  Paul was released to Yvonne's care on April 6, 2011.

In the early morning of February 23, 2011, Paul's father, P.C. (Phil) had a hostile encounter with Yvonne and hospital personnel.  Yvonne complained to Phil that he was not supporting the baby's head properly while holding him.  Phil became confrontational and threatened to take the child from the hospital.  The hospital's staff asked Phil to leave and, when he refused, he was removed by the police and hospital security.  Later that same day, Yvonne obtained a domestic violence temporary restraining order.  The order was based not only on the events at the hospital, but also on Yvonne's allegations that Phil previously had thrown her down a set of stairs and choked her.

A week afterwards, at Yvonne's request, the restraining order was dismissed.  At the abuse and neglect hearing, Yvonne

---

[5] Neonatal abstinence syndrome is defined as "[a]ny of the adverse consequences in the newborn of exposure to addictive or dangerous intoxicants during fetal development."  Taber's Cyclopedic Med. Dictionary, supra, at 1158.

stated that, although she and Phil had their "share of fights," she felt pressured to seek a restraining order and lied about the prior bouts of domestic violence from fear of losing Paul.

As a result of the domestic violence episode in the hospital, the police referred the matter to the Division of Youth and Family Services. This was the beginning of the Division's involvement with Yvonne and Paul.

On March 15, 2011, Phil called the Division, claiming that he observed Yvonne high on drugs. Three days later when Yvonne went to Habitare for her methadone treatment, she was told she would have to submit to a random drug test. According to Yvonne, she waited fifteen minutes to give a urine sample, but then had to leave because a cab whose fare she had pre-paid was outside honking its horn. She testified that she returned the next day to Habitare but was told she already had been marked down for a refusal. Habitare considered her failure to submit to the urine analysis the equivalent of a positive test result.

On April 5, 2011, the Division filed a complaint, seeking care, custody, and supervision of Paul. N.J.S.A. 30:4C-12. The complaint also alleged that Yvonne abused or neglected Paul based on Yvonne's prior drug history, her refusal to take the March 18 drug test, Paul's methadone withdrawal, and the domestic violence involving Yvonne and Phil. N.J.S.A. 9:6-8.21. The day after the filing of the complaint, Yvonne passed a drug

test, and the family court released Paul to her custody.[6]

At the conclusion of the abuse and neglect hearing on June 29, 2011, the family court determined that the Division had proven abuse or neglect by a preponderance of the evidence. The court conceded that the Division had not presented "overwhelming testimony" or "the strongest case in the world." The court also commended Yvonne for entering a recognized detoxification program and acknowledged that she had "made strides." Nevertheless, the court maintained that the evidence presented by the Division was sufficient to prove abuse or neglect. The court found Yvonne's "credibility very questionable," particularly given her recantation of her domestic violence claims.

In rendering its decision, the court made the following findings: (1) Yvonne had a long drug history dating back to 2005; (2) Yvonne became aware that she was pregnant but continued to "expose" her unborn child to drugs for another four months before her entry into the Habitare program, one month before Paul's birth; (3) Yvonne refused to take a random drug test in March 2011 even though she was "reasonably compliant"

---

[6] Yvonne tested positive for cocaine on April 18, 2011, but that test post-dated the complaint and was not part of the Division's proofs at the abuse and neglect hearing.

with the program; and (4) she has the potential to expose her child to domestic violence. Last, the court expressed that "[w]hen a child is born drug exposed to illicit drugs, we routinely say that's abuse and neglect." The court permitted Yvonne to retain physical custody of Paul, but under the care and supervision of the Division.

Yvonne appealed the court's finding of abuse or neglect.

## II.

### A.

In affirming the family court's abuse or neglect finding, the Appellate Division focused solely on the harm suffered by Paul due to his methadone withdrawal. Y.N., supra, 431 N.J. Super. at 80-84. The panel rejected Yvonne's contention that a "finding of abuse or neglect cannot be based upon her ingestion of methadone from 'a legitimate program providing assistance from withdrawal.'" Id. at 81. The panel noted that "Paul's severe withdrawal, which required treatment in the [neonatal intensive care unit] and numerous doses of morphine over an extended period of time, is compelling evidence of actual impairment." Id. at 82. The panel then determined that "[w]here there is evidence of actual impairment, it is immaterial whether the drugs taken were from a legal or illicit source." Ibid. In the panel's view, "[t]he fact that defendant obtained the methadone from a legal source does not preclude our

10

consideration of the harm it caused to the newborn." Id. at 81. The panel maintained that "[a]n inquiry under N.J.S.A. 9:6-8.21 [the abuse and neglect statute] must focus on the harm to the child, rather than on the intent of the caregiver." Ibid.

In a footnote, the panel observed that it did "not appear that anyone from [the hospital] notified the Division that Yvonne gave birth to a child suffering withdrawal symptoms." Id. at 78 n.3. The panel then added: "We take this opportunity to note that N.J.S.A. 9:6-8.10 requires 'any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or otherwise.'" Ibid.

Last, because "defendant admit[ted] that her use of methadone caused Paul's withdrawal symptoms," the panel found it unnecessary to "consider her claim that the Division failed to prove that her prenatal use of Percocet and OxyContin caused harm to Paul or exposed him to a risk of harm." Id. at 84.

B.

We granted Yvonne's petition for certification, N.J. Dep't of Children & Families v. Y.N., 216 N.J. 13 (2013), which presented two questions: (1) whether, under N.J.S.A. 9:6-8.21(c)(4)(b), a finding of abuse or neglect can be sustained against a woman who, while addicted to drugs, learns she is

11

pregnant and enters a bona fide methadone treatment program, and whose child suffers methadone withdrawal symptoms at birth; and (2) whether a physician is required to make an abuse or neglect report to the Division pursuant to N.J.S.A. 9:6-8.10, whenever a child is born with neonatal abstinence syndrome resulting from a mother's prenatal medical treatment.

We also granted the motions of four parties to participate as amici curiae: Legal Services of New Jersey (Legal Services); Statewide Parent Advocacy Network, Inc.; Experts in Maternal and Fetal Health, Public Health, and Drug Treatment; and the American Civil Liberties Union of New Jersey and the American Civil Liberties Union Foundation (ACLU).

### III.

### A.

Yvonne argues that the Appellate Division erred in holding that abuse or neglect can be found under N.J.S.A. 9:6-8.21(c)(4)(b) based merely on a harm caused to a child without proof that the parent unreasonably inflicted the harm by departing from the necessary minimum degree of care. Yvonne contends that she followed medical advice not to abruptly stop taking Percocet to avoid a potential miscarriage or harm to her fetus. She also points out that the Division did not present any evidence that Paul's neonatal abstinence syndrome symptoms "would have been milder, of shorter duration, or avoided

12

entirely if she entered treatment earlier." She submits that she did not unreasonably inflict harm on her newborn by securing methadone treatment for her preexisting Percocet addiction. She claims that she made an informed medical decision -- entitled to constitutional protection -- to enter a detoxification program to minimize the more serious side effects to her unborn child rather than continue to use Percocet or suddenly terminate its use.

In response to the Appellate Division's footnote on reporting child abuse, Yvonne maintains that healthcare officials have no mandatory requirement under N.J.S.A. 9:6-8.10 to report the "treatable side effects of [neonatal abstinence syndrome]" caused by a mother's participation in a medically approved methadone program.

B.

Amici, Legal Services; Statewide Parent Advocacy Network; Experts in Maternal and Fetal Health, Public Health, and Drug Treatment; and ACLU, all submit that the Appellate Division erred in finding that a newborn child who experiences neonatal abstinence syndrome as the result of a mother's participation in a medically prescribed methadone treatment program is an abused or neglected child under N.J.S.A. 9:6-8.21(c)(4)(b). Among the arguments offered by amici are these: (1) "a parent's adherence to a bona fide treatment plan prescribed by a licensed health

13

professional cannot rise to the level" of gross negligence, recklessness, or willful or wanton conduct, a necessary predicate for a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b); (2) Yvonne should not be punished for entering a methadone treatment program for an addiction that preexisted her pregnancy when treatment will mitigate the risks to her child; (3) pregnant women suffering drug addiction should not be discouraged from entering a methadone maintenance program, which is the most effective treatment for opioid dependence and which has treatable effects on a newborn; and (4) a woman has a constitutional right to self-autonomy in making medically approved decisions for her health and her child's health. In short, amici contend that a woman addicted to drugs who becomes pregnant and secures medical advice, who discloses all relevant information to a medical professional, and who complies with a prescribed detoxification treatment plan has not abused or neglected her newborn, even if the child suffers methadone withdrawal symptoms.

C.

The Division urges this Court to affirm the appellate panel. The Division contends that it is unnecessary to decide whether Yvonne "failed to exercise a minimum degree of care" because Paul "suffered actual harm, and that harm was severe enough to meet the statutory requirements of N.J.S.A. 9:6-

14

8.21(c)(4)(b)." According to the Division, Yvonne's intentions are irrelevant and all that matters is whether her conduct caused harm to her child. The Division maintains that Paul's neonatal abstinence syndrome was evidence of harm sufficient for an abuse or neglect finding, even if Yvonne's use of methadone was directed by healthcare professionals. Additionally, the Division asks this Court to affirm the Appellate Division's judgment because the evidence in the record is ample to support the trial court's finding of abuse or neglect. The Division points "to multiple factors that placed [Paul] at substantial risk of harm," such as "[Yvonne's] illegal drug use during pregnancy," her four-month delay in securing addiction treatment after learning of her pregnancy, her "continued substance abuse after Paul's birth," and her lack of honesty in recounting the domestic violence involving Phil.

The Division submits that the Appellate Division's footnote was a necessary reminder to hospital personnel of their reporting obligation pursuant to N.J.S.A. 9:6-8.10. It insists that a physician should contact the Division whenever a child is suffering from "significant" drug withdrawal symptoms. The Division states that an investigation is the best vehicle for "determining whether a child requires and deserves the protections afforded by Title [Nine]."

15

Paul's Law Guardian urges the Court to uphold the family court's determination that Yvonne abused or neglected Paul. Although the Law Guardian argues that the actual harm suffered by Paul was sufficient for a finding of abuse or neglect, he asks that we look to the entirety of the family court's factual findings. In particular, the Law Guardian points to the court's findings on Yvonne's prior drug use, her involvement in domestic violence, and her four-month delay in entering a detoxification program. He claims that this delay in getting treatment increased the risk of harm to Paul.

Last, the Law Guardian comments that the Appellate Division's footnote on a hospital's obligation to report child abuse is "dicta" and irrelevant to the issues in this case, and therefore should not be reviewed in this appeal.

IV.

A.

The primary issue in this case involves statutory interpretation: whether a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b) can be based solely on the harm caused to Paul by methadone withdrawal -- without regard to whether Yvonne acted unreasonably or with a minimum degree of care. In addressing that issue, we must identify the statutory elements necessary to prove abuse or neglect under N.J.S.A. 9:6-

16

8.21(c)(4)(b).

"In construing the meaning of a statute, our review is de novo," and therefore we need not defer to the Appellate Division's or trial court's interpretive conclusions. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012); see also Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

"Our paramount goal in interpreting a statute is to give effect to the Legislature's intent." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012). The starting point of all statutory interpretation must be the language used in the enactment. Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 536 (2013); see also N.J.S.A. 1:1-1 (stating that words of statute are customarily construed according to their "generally accepted meaning"). "If the statutory language is clear and unambiguous, and reveals the Legislature's intent, we need look no further." Farmers Mut., supra, 215 N.J. at 536. Only when faithful adherence to the words of the statute leads to more than one plausible interpretation or to an absurd result or to a result at odds with the objective of the overall legislative scheme do we look to extrinsic sources, such as legislative history. Ibid.;

17

DiProspero v. Penn, 183 N.J. 477, 492-93 (2005).

With those principles in mind, we turn first to the purpose, nature, and consequences of abuse and neglect proceedings and then to the contents of the statute in question.

B.

New Jersey's child-welfare laws balance a parent's right to raise a child against "the State's parens patriae responsibility to protect the welfare of children." N.J. Dep't. of Children and Families v. A.L., 213 N.J. 1, 17-18 (2013) (internal quotation marks omitted). One of Title Nine's primary purposes is to protect children "who have had serious injury inflicted upon them" and to safeguard them "from further injury and possible death." N.J.S.A. 9:6-8.8(a). To that end, Title Nine provides for the civil prosecution of a parent or guardian who abuses or neglects a child. N.J.S.A. 9:6-8.33.

In this case, the Title Nine proceedings began when the Division filed a complaint alleging that Yvonne had abused or neglected her newborn, Paul. See ibid. At the fact-finding hearing, the Division bore the burden of proving abuse or neglect by a preponderance of the evidence based on "competent, material and relevant evidence." N.J.S.A. 9:6-8.46(b).

A finding of abuse or neglect against a parent may result in significant and longstanding adverse consequences. A.L., supra, 213 N.J. at 25. The parent's name and information

18

concerning the case are forwarded to a Central Registry and kept on file by the Department of Children and Families. See N.J.S.A. 9:6-8.11. That information may be released to certain entities responsible for "employment-related screening of an individual . . . seeking employment with an agency or organization providing services to children," N.J.S.A. 9:-8.10a(b)(13), as well as to doctors, courts, and child welfare agencies. N.J.S.A. 9:6-8.10a(b)(1),(3),(4),(5),(6),(13); see also N.J.S.A. 9:6-8.10e (mandating that Division conduct check of child abuse registry for each person seeking registration as professional guardian); N.J.S.A. 30:5B-25.3 (mandating child abuse registry check for applicant seeking daycare facility licensure). A court, moreover, "can enter a dispositional order that places the child in the custody of a relative or another suitable person for a substantial period of time." A.L., supra, 213 N.J. at 25-26 (citing N.J.S.A. 9:6-8.50(d), -8.51(a), -8.54(a)). Finally, and perhaps most significantly, an abuse or neglect finding may provide a basis for an action to terminate a parent's custodial rights to a child. N.J.S.A. 30:4C-15(a) (allowing petition to terminate parental rights based on adjudication of abuse or neglect).

Strict adherence to the statutory standards of N.J.S.A. 9:6-8.21(c)(4) is important because the stakes are high for all parties concerned.

19

C.

A child may be abused or neglected in different ways in violation of Title Nine. N.J.S.A. 9:6-8.21(c). Here, the Division proceeded on a theory that Yvonne abused or neglected her child by violating a subpart of N.J.S.A. 9:6-8.21(c). N.J.S.A. 9:6-8.21(c)(4)(b) defines an abused or neglected child as a child

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [N.J.S.A. 9:6-8.21(c)(4)(b) (emphasis added).]

The plain language of N.J.S.A. 9:6-8.21(c)(4)(b) requires proof that the child was impaired or in imminent danger of becoming impaired because the parent (1) failed to exercise a minimum degree of care and (2) unreasonably inflicted or allowed to be inflicted harm, or created a substantial risk of inflicting harm, on the child. The statute makes clear that parental fault is an essential element for a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b). The Division must establish that a parent failed "to exercise a minimum degree of

20

care" in a prosecution under N.J.S.A. 9:6-8.21(c)(4)(b). N.J. Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309-10 (2011) (concluding that Division failed to prove abuse or neglect because parent's conduct did not constitute failure to exercise minimum degree of care); N.J. Div. of Youth & Family Servs. v. S.N.W., 428 N.J. Super. 247, 249 (App. Div. 2012) (reversing adjudication of abuse or neglect because trial court did not make finding that "defendant failed to provide a minimum degree of care").

At the very least, a minimum degree of care means that a parent's conduct must be "grossly negligent or reckless." T.B., supra, 207 N.J. at 306. In contrast, a parent's negligent conduct is not sufficient to justify a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b). Id. at 306-07; see also N.J. Dep't of Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 168-69 (App. Div. 2009) (reversing abuse or neglect finding because mother's conduct, although "arguably inattentive or even negligent," was not grossly negligent or reckless). A civil prosecution under N.J.S.A. 9:6-8.21(c)(4)(b) also requires proof that a parent "unreasonably" inflicted harm. However, it follows that a parent who causes harm to a child by grossly negligent or reckless conduct has acted unreasonably.

We need not look beyond the words of N.J.S.A. 9:6-8.21(c)(4)(b). We will not read out of the statute the

21

standard-of-care language that the Legislature pointedly included as a prerequisite to a finding of abuse or neglect. See DiProspero, supra, 183 N.J. at 492 (noting that court "cannot write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment" (internal quotation marks omitted)). N.J.S.A. 9:6-8.21(c)(4)(b) is not a strict liability statute. It does not suggest that a finding of abuse or neglect can be premised solely on a harm caused to a child without consideration of the reasonableness of the parent's conduct.

Sometimes a parent may cause injury to a child to protect that child from a greater harm. Under those circumstances, the parent may be acting reasonably. Simply stated, the statute requires more than a mere showing of harm to a child. The Division must establish that, at a minimum, a parent acted with gross negligence or recklessness to succeed in a prosecution under N.J.S.A. 9:6-8.21(c)(4)(b).

The Appellate Division relied on In re Guardianship of K.H.O., 161 N.J. 337 (1999), State v. Tamburro, 68 N.J. 414 (1975), and A.L., supra, 213 N.J. 1, in support of its position that harm alone is sufficient for an adjudication of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b). Those cases do not support the conclusion reached by the Appellate Division.

K.H.O., supra, was a parental-termination case arising

22

under N.J.S.A. 30:4C-15.1(a).  161 N.J. at 345.  In that case, the mother abused heroin during her pregnancy and did not seek drug treatment until after her child's birth.  Id. at 344.  Her child was born "suffering from heroin withdrawal, cleft palate syndrome, and respiratory difficulties."  Ibid.  We noted that generally "[d]rug use during pregnancy, in and of itself, does not constitute a harm to the child."  Id. at 349.  We held, however, that because the baby was born suffering withdrawal symptoms from heroin addiction, the State met prong one of the four-part, parental-termination test:  "[t]he child's safety, health or development has or will continue to be endangered by the parental relationship," N.J.S.A. 30:4C-15.1(a).  Id. at 349-50.

K.H.O. is not comparable to the present case.  K.H.O. did not involve Title Nine or an interpretation of similar statutory language relating to the minimum level of care owed to a child. It did not involve a mother who sought and entered a drug treatment program prescribed by medical professionals for her and her newborn's care.  Significantly, here, at the time of Paul's birth, Yvonne was taking methadone -- a prescribed medication administered pursuant to a bona fide program to treat her addiction.  Unlike the child in K.H.O., Paul was born suffering withdrawal symptoms from medication lawfully taken by his mother, as recommended by her doctor.

23

Tamburro, supra, is also inapposite because, there, we construed N.J.S.A. 39:4-50, the driving under the influence statute. 68 N.J. at 420-21. In that case, we simply determined that, based on its language, N.J.S.A. 39:4-50 is a strict liability statute. Id. at 421. We came to the unremarkable conclusion that a person is no less guilty of driving under the influence of methadone than of driving under the influence of alcohol or any other drug. Ibid. One can lawfully take methadone or imbibe alcohol. Ibid. However, driving under the influence of either drugs or alcohol is a violation of N.J.S.A. 39:4-50. Ibid.

Last, the Appellate Division's reliance on A.L. is misplaced. In that case, a mother ingested cocaine during the course of her pregnancy, and her newborn's first stool tested positive for "cocaine metabolites." A.L., supra, 213 N.J. at 9. The child, however, did not suffer any withdrawal symptoms or any other identifiable harm. Id. at 11. Nevertheless, the Division of Youth and Family Services contended that the presence of cocaine in the child's system established that the mother posed a substantial risk of harm to the child and therefore the child was abused or neglected under N.J.S.A. 9:6-8.21(c)(4)(b). Id. at 13.

On appeal, the mother in A.L. did not argue that taking cocaine during pregnancy might not breach the minimum level of

24

care mandated by the statute. Id. at 15-16. Rather, we addressed the mother's argument that "N.J.S.A. 9:6-8.21(c)(4) does not apply to a fetus or a pregnant woman absent harm or imminent risk of harm to a child after birth." Id. at 15. We stated in A.L. that, absent evidence of actual impairment to the child, "the critical focus is on evidence of imminent danger or substantial risk of harm." Id. at 22. We noted that "[p]roof that a child's mother frequently used cocaine or other dangerous substances during pregnancy would be relevant to that issue," but added that "not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect in light of the specific language of the statute." Id. at 23. In A.L., we found that the presence of cocaine metabolites in the newborn's stool, without anything more, including expert testimony to explain its meaning and significance, was insufficient to sustain an abuse or neglect determination. Id. at 29-30.

Importantly, A.L. did not address the scenario of a child experiencing withdrawal symptoms from medication lawfully prescribed by a physician to the child's mother to treat her addiction.

In short, none of those three cases resolves the issue before us.

V.

The issue here is whether the Appellate Division erred in determining that Yvonne violated the abuse and neglect statute solely because her newborn suffered neonatal abstinence syndrome as a result of her participation in a medically prescribed methadone maintenance treatment program.  In our view, the Appellate Division went astray by concentrating on harm without regard to parental fault.  We reject the Appellate Division's conclusion that "[w]here there is evidence of actual impairment, it is immaterial whether the drugs taken were from a legal or illicit source."  Y.N., supra, 431 N.J. Super. at 82.  We cannot ignore the other statutory elements of N.J.S.A. 9:6-8.21(c)(4)(b) -- whether Yvonne exercised a "minimum degree of care" or "unreasonably" inflicted harm on her newborn.

Whether a parent exercised a minimum degree of care must "be analyzed in light of the dangers and risks associated with the situation."  G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999).  A woman who becomes addicted to lawfully prescribed medication and then learns she is pregnant is confronted with a choice -- either to seek treatment that will improve the outcome for her newborn or to continue on the path of her addiction.  The reasoning of the Appellate Division creates a perverse disincentive for a pregnant woman to seek medical help and enter a bona fide detoxification treatment

26

program that will address her and her baby's health needs.  In weighing the relative harms facing the child, the greater potential harm is if the mother does not secure proper prenatal care, including treatment for her drug dependency.  Nothing in N.J.S.A. 9:6-8.21(c)(4)(b) suggests that a woman is not exercising the minimum level of care by obtaining timely medical advice and by timely entering a medically approved detoxification program that will improve the outcome for her newborn.

According to the record in this case, before she knew she was pregnant, Yvonne was addicted to a prescribed opioid, Percocet, which she had been taking to deal with a physical injury.  Yvonne followed the advice of a medical professional and later entered into a methadone maintenance program.  According to the Centers for Disease Control and Prevention, methadone maintenance treatment is "the most effective treatment for opiate addiction" and leads to "improved pregnancy outcomes."  Ctrs. for Disease Control & Prevention, Methadone Maintenance Treatment, 1 (2002), http://www.cdc.gov/idu/facts/methadonefin.pdf.  The United States Department of Health and Human Services has reported that methadone maintenance treatment can save the life of a baby born to an addicted mother and that a newborn experiencing methadone withdrawal is far better off than a newborn addicted to heroin.

27

Substance Abuse and Mental Health Servs. Admin., U.S. Dept. of Health and Human Servs., Methadone Treatment for Pregnant Women (2014), available at, http://store.samhsa.gov/shin/content//SMA14-4124/SMA14-4124.pdf.

Commentators warn that finding a mother liable of abuse or neglect for her newborn's neonatal abstinence syndrome after the mother has made an informed medical decision to undergo methadone maintenance treatment will discourage women from entering detoxification programs that will likely improve their children's health prospects. Martha A. Jessup, et al., Extrinsic Barriers to Substance Abuse Treatment Among Pregnant Drug Dependent Women, 33 J. Drug Issues 285, 291 (2003) (noting that pregnant woman's fear of seeking appropriate medical help for addiction will have adverse consequences on newborn's health); see also U.S. Gen. Accounting Office, GAO/HRD-90-138, Report to the Chairman, Comm. on Finance, U.S. Senate, Drug-Exposed Infants: A Generation at Risk 9 (1990) ("[T]he increasing fear of incarceration and losing children to foster care is discouraging pregnant [addicts] from seeking care."); Marilyn L. Poland, et al., Punishing Pregnant Drug Users: Enhancing the Flight from Care, 31 Drug and Alcohol Dependence 199, 202 (1993) (noting "that substance using pregnant women [will] 'go underground'" if they fear incarceration and loss of children following treatment for their addiction).

28

N.J.S.A. 9:6-8.21(c)(4)(b) does not require a finding of abuse or neglect when an addicted woman, who learns that she is pregnant, seeks timely professional treatment for her addiction that will improve the outcome for her unborn child. We hold that, absent exceptional circumstances, a finding of abuse or neglect cannot be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she has made full disclosure.

We therefore reverse the Appellate Division's determination that the withdrawal symptoms experienced by Paul resulting from Yvonne's participation in a bona fide methadone maintenance program was, standing alone, a sufficient basis for a finding of abuse or neglect.

We have resolved only the issue before us. We do not pass on whether there is sufficient credible evidence to support an abuse or neglect finding on some other basis referenced by the family court, such as the timeliness of Yvonne's seeking drug treatment -- that is, whether an unjustified delay might have adversely affected her newborn's later withdrawal symptoms. We also do not address whether Yvonne violated the abuse and neglect statute because of the manner in which she responded to the domestic violence allegedly committed against her. We therefore remand to the Appellate Division to decide whether

29

there is sufficient credible evidence in the record to support the finding of abuse or neglect on an alternate theory articulated by the family court.

## VI.

Last, the Appellate Division's footnote on the child abuse reporting requirement under N.J.S.A. 9:6-8.10 does not resolve whether a hospital has a legal duty to report when a newborn is afflicted with neonatal abstinence syndrome resulting from a mother's participation in a medically approved methadone maintenance program.[7]  That issue was not properly joined in this case.  It was not raised, argued, or briefed in the family court or Appellate Division.  The hospital and its professional personnel -- whose interests were directly implicated by the footnote -- were not parties to the abuse and neglect litigation and therefore had no opportunity to address the scope of their reporting requirement.  No party in this case had a similar adversity of interest to that of the hospital and its professional staff.  This case does not present an appropriate vehicle -- either for the Appellate Division or this Court -- to discuss a hospital's reporting requirement under N.J.S.A. 9:6-

---

[7] As noted earlier, N.J.S.A. 9:6-8.10 states that "[a]ny person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or otherwise."

8.10, and therefore the footnote has no effect.

                              VII.

    For the reasons given, we reverse the judgment of the Appellate Division.  We remand to the Appellate Division for further consideration of whether there is any alternative basis on which to sustain the family court's finding of abuse or neglect.  We express no opinion on that subject.

    CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE ALBIN's opinion. JUDGE CUFF (temporarily assigned) did not participate.

SUPREME COURT OF NEW JERSEY

NO. __A-24__ SEPTEMBER TERM 2013

ON CERTIFICATION TO _____ Appellate Division, Superior Court _____

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

      Plaintiff-Respondent,

          v.

Y.N.,

      Defendant-Appellant,

          and

P.C.,

      Defendant.

_____
IN THE MATTER OF P.A.C., a minor.

DECIDED _____ December 22, 2014 _____
          Chief Justice Rabner          PRESIDING
OPINION BY _____ Justice Albin _____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | ---------------------- | -------------------- |
| TOTALS | 6 | |