# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0217-23
A-0607-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.R. and M.M.,

     Defendants-Appellants/
     Cross-Respondents.

_____

IN THE MATTER OF L.M.,
a minor,

     Cross-Appellant.

_____

     Argued September 24, 2024 – Decided October 15, 2024

     Before Judges Chase and Vanek.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0140-23.

Catherine W. Wilkes, Assistant Deputy Public Defender, argued the cause for appellant/cross-respondent M.M. (Jennifer Nicole Sellitti, Public Defender, attorney; Catherine W. Wilkes, of counsel and on the briefs).

David Anthony Gies, Designated Counsel, argued the cause for appellant/cross-respondent J.R. (Jennifer Nicole Sellitti, Public Defender, attorney; David Anthony Gies, on the briefs).

Jennifer Marie Sullivan, Assistant Deputy Public Defender, argued the cause for minor/cross-appellant (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer Marie Sullivan, of counsel and on the briefs).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Mary L. Harpster, on the brief).

PER CURIAM

In these consolidated appeals of this Title Nine matter, defendants J.R.[1] and M.M. appeal from an August 7, 2023 Family Part order determining it was "established"[2] they educationally neglected their daughter, L.M. in violation of

---

[1] We use initials and pseudonyms to protect the privacy of the family. R. 1:38-3(d)(12).

[2] Because the Division's finding was "established," not "substantiated," the parties were not placed on the Central Registry. N.J.A.C. 3A:10-7.7(a)

A-0217-23

N.J.S.A. 9:6-8.21(c)(4)(a). The Law Guardian agrees and cross-appeals. Because Title Nine is not a strict liability statute, we vacate and remand.

I.

We summarize the facts from the record developed at the fact-finding hearing. J.R. and M.M. are the parents of L.M., born in 2009. The Division of Child Protection and Permanency ("DCPP" or "Division") became involved with the family in January 2017 due to a call from L.M.'s former pediatrician to express concerns then-seven-year-old L.M. might not be receiving appropriate medical care. The doctor reported L.M. had conflicting diagnoses of vasculitis and serum sickness. The doctor stated she had referred the family to University Hospital for care in September 2015 and had L.M. removed as her patient because J.R. and the doctor did not get along. Despite this, a year later, J.R. started contacting the doctor's practice and "harassing" them to schedule an appointment. In her report to DCPP, the doctor questioned whether L.M. had been treated during that period. She also reported the family was Brazilian and spoke Portuguese.

When DCPP investigator, Nicole Crank, spoke with the parents to complete a child welfare assessment, J.R. alleged she had taken L.M. to multiple doctors without success and had been told L.M.'s diagnosis was vasculitis

complex disease and not serum sickness. Because J.R. and M.M. spoke almost no English, after the first interview, DCPP either brought a translator or had one assist by phone. J.R. also reported Mountainside Hospital had diagnosed L.M. with autism, but another doctor had rejected that diagnosis.

Investigator Crank requested Dr. Medina, at the Child Protection Center ("CPC"), review L.M.'s medical records and make recommendations to assist the family. J.R. then provided the Division with L.M.'s medical records. A subsequent report by Dr. Medina recommended L.M.'s medical records be provided to all doctors and for the Division to assist the family in locating Portuguese-speaking health providers and specialists. The family's case was closed in June 2017 without those actions being completed.

In December 2021, L.M.'s school nurse contacted the Division to report that L.M. could not attend school unless her parents provided medical documentation confirming their claim that L.M. was allergic to the two required immunizations. The school reported L.M. was classified as autistic. DCPP advised L.M. was "diagnosed with Serum sickness and/or Vasculitis" and she could not receive immunizations or take medications because she would have a reaction. However, DCPP also informed the nurse it would not get involved and

coded the referral "Information & Referral" to document it in their internal system.

In March 2022, the school again contacted DCPP to report that L.M.'s parents had not provided proof that she could not be vaccinated and therefore, L.M. had missed over fifty days, and the school was taking the parents to truancy court. The Division requested an update after truancy court and again declined to get involved.

In September 2022, L.M.'s school again contacted the Division to report L.M. had not attended school since December 14, 2021, but she did not have to repeat the grade. The school reported J.R. had a truancy court hearing scheduled in November 2022 because L.M. now had seventy-nine absences. The school claimed J.R. refused to name the doctor who declined to administer L.M.'s immunizations and referred the school to her attorney.

On September 30, 2022, DCPP intake worker Chrissy Fitts contacted J.R. and planned to meet with her the following week. When Fitts arrived to meet with J.R., Fitts was unaware that a DCPP representative had picked up L.M. and transported her to the hospital. The next day, J.R. sent the caseworker a text message advising her to contact the family's lawyer.

Almost a month later Fitts met with J.R. and her attorney on a video conference. J.R. reported she could not get a doctor to submit a note for the school, but she hoped L.M. could return to school after seeing her doctor for a wellness visit. A few days later, Fitts noted that J.R. was still waiting for the doctor's note and J.R. had informed her that her lawyer was taking care of everything. Fitts also interviewed L.M., who told her that she was doing well. Fitts noted L.M. was "well dressed" and "clean." Fitts documented L.M. was also "safe in the care of her parents," and was scheduled to meet with her doctor "regarding an excuse vaccine letter." Fitts then recommended "[t]ermination of [DCPP] involvement."

J.R. attended two truancy court hearings in November and December 2022 and received options for in-home schooling or returning to school with an exemption letter from L.M.'s pediatrician. J.R. declined homeschooling. J.R. failed to attend the January 2023 truancy court hearing and was fined $250.

Additionally, in January, J.R. told Fitts that L.M.'s doctor would not give her a note regarding her daughter's vaccine allergy. She informed Fitts she had found a Brazilian pediatrician, Dr. Polina DaSilva, at Beth Israel Hospital and wanted this doctor to issue a letter so L.M. could attend school. The next day, DCPP called the hospital and discovered Dr. DaSilva was no longer seeing

6

children at the clinic. Although Dr. DaSilva had apparently seen L.M. on November 7, 2022, DCPP made no attempts to obtain those medical records or find out what had occurred at that visit.

In January 2023, DCPP received another referral from L.M.'s school. Fitts attempted to assist the family by scheduling an allergist appointment for L.M. to confirm what allergies she had and assess whether she could have the vaccines, but J.R. refused to take L.M. and stated she wanted to take L.M. to her own doctor and she would schedule an appointment.

The record shows L.M. had missed ninety days of school from September 5, 2022, until the school unenrolled her on February 17, 2023. Fitts testified that she repeatedly spoke with J.R. or M.M. to discuss arranging in-home schooling for L.M., however, J.R. only wanted L.M. to attend in person and M.M. "went along with whatever [J.R.] was saying."

At the end of February 2023, Fitts and the Division held a family team meeting with J.R., M.M., and school personnel. Before the meeting ended, J.R. agreed to take L.M. to the doctor so she could return to school and to also provide in-home instruction in the meantime. J.R. re-registered L.M. for school the same day. When Fitts followed up towards the end of March, L.M. still had not been to the doctor or began home-schooling. For the first time, J.R. told

Fitts that L.M. was spending her days at the library doing arts and crafts with the staff.[3]

On April 11, 2023, the Division filed for and received care and supervision of L.M. as she was still not back in school, and the parents had refused in-home services. On April 17, 2023, six days after filing the complaint, DCPP received a letter from Dr. DaSilva regarding L.M.'s vaccine allergy. The letter stated vaccinations would be administered one at a time, with a break between, due to L.M.'s medical history. The record shows L.M. received her first vaccination on May 1, 2023. On May 3, 2023, the court held the return on the order to show cause hearing. DCPP advised that after waiting a month to determine if there was a reaction, L.M. was due to receive her second shot.

At the June 26, 2023 case management conference, L.M.'s attorney reported L.M. was back at school and scheduled to graduate. The child's attorney reported L.M. was "doing excellent and passing all her classes." The school was considering declassifying her as special needs so that she no longer needed an Individualized Education Program ("IEP"). L.M. would also be

---

[3] At trial, J.R. asserted she had hired a tutor to work with L.M. at home from June 2022 through May 2023.

8                                                                                    A-0217-23

attending high school in the fall. DCPP reported L.M. had received the last required vaccine.

DCPP informed the court of its finding that J.R. and M.M. were established for "educational neglect" and asked the court to dismiss the case after the Title Nine abuse or neglect fact-finding was concluded because L.M. was up to date on her vaccinations and on track to graduate on time. The court then took testimony on July 26 and July 31, 2023, using an interpreter to translate for the parents. DCPP called caseworker Fitts as its only witness. J.R. testified in her own defense. Neither M.M. nor the Law Guardian called any witnesses.

On August 7, 2023, the trial court issued an order that J.R. and M.M. had educationally neglected L.M. In an oral statement of reasons, the court made findings.

The court relied on the testimony of caseworker Fitts, which it found to be "relatively credible" although it acknowledged "she did not have the command of the Division's file" and she had "points [she] could not explain why her recollection differed from that in the investigative summary." In contrast, the court found J.R. "did not listen to the questions asked regardless of who was asking them," and her testimony was "replete with inconsistencies." The court

9

found J.R.'s testimony regarding the hiring of a tutor "to be entirely unbelievable" since she could not remember the tutor's name, did not mention the tutor to the Division or the school—despite allegedly hiring the tutor for almost a year, and L.M. herself never mentioned a tutor and only said she did arts and crafts at the library.

The court found educational neglect under Title Nine "relies on the harm to the child by depriving them of the physical ability to attend school" and "falls into the realm of strict liability," namely that the reason why the child is not in school or similarly educated appear to be immaterial. The court held a finding pursuant to the statute "is not dependent on the reasonable efforts of the Division. The finding falls squarely upon the action or inactions of the parent." Although the court could not determine if J.R. asked for or accepted help from DCPP, the court found DCPP informed J.R. that L.M. needed to be vaccinated or she needed to get a doctor's note.

The court further found J.R. made "multiple efforts to secure a doctor for L.M." in 2014 and 2017, then "fell off again until 2021 when J.R. located Dr. DaSilva," who provided her with the note necessary to re-enroll L.M. in school. The court found J.R. was "a resourceful parent who utilized her community to assist her daughter." The court found J.R.'s language barrier was an issue in

2014 and 2017 but was not a barrier when she sought a doctor by reaching out to other Brazilian mothers. The court found L.M.'s more than one hundred absences from school was "in and itself" educational neglect. The court expressed sympathy for L.M.'s medical situation but determined that J.R. had "the power to secure either the vaccine or a note, which she ultimately did." The court determined that since M.M. acquiesced to J.R.'s "command of [L.M.]'s schooling," his failure to act made him responsible for L.M.'s educational neglect. The court determined homeschooling was never "a viable option" because the parents only spoke Portuguese and the child was autistic. The court concluded J.R.'s only options were to have L.M. vaccinated or obtain a doctor's note.

This appeal followed.

## II.

Ordinarily, we defer to the Family Court's factual findings, as long as they are supported by substantial credible evidence in the record. N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 226 (2010); N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). "Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our review." N.J.

Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)).  We also accord no deference to the trial court's legal conclusions, which we review de novo.  N.J. Div. of Child Prot. & Perm. v. D.C.A., 256 N.J. 4, 19 (2023); State v. Smith, 212 N.J. 365, 387 (2012); see also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"The fact-finding hearing is a critical element of the abuse and neglect process . . . ."  N.J. Div. of Youth & Fam. Servs. v. P.C., 439 N.J. Super. 404, 413 (App. Div. 2015).  In pertinent part, N.J.S.A. 9:6-8.21(c)(4)(a) defines an "abused or neglected child" as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [the child's] parent . . . to exercise a minimum degree of care . . . in supplying the child with adequate . . . education, . . . though financially able to do so or though offered financial or other reasonable means to do so . . . .
>
> [(emphases added).]

The statute does not require a child to experience actual harm.  N.J. Dep't of Child. & Fams., Div. of Child Prot. & Perm. v. E.D.-O., 223 N.J. 166, 178 (2015).  However, "in a case where there is no such proof, the critical focus is

on evidence of imminent danger or substantial risk of harm." N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013).

Further, "[t]o find abuse or neglect, the parent must 'fail[] . . . to exercise a minimum degree of care.'" E.D.-O., 223 N.J. at 179 (second alteration in original) (quoting N.J.S.A. 9:6-8.21(c)(4)(b)). A "minimum degree of care" encompasses "conduct that is grossly or wantonly negligent, but not necessarily intentional." Id. at 188 (quoting G.S. v. Dep't of Hum. Servs., Div. of Youth & Fam Servs., 157 N.J. 161, 178 (1999)). Wanton negligence is conduct that is engaged in with the parent's knowledge that injury is likely to result. Ibid. Mere negligence does not trigger the statute. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 306-07 (2011); G.S., 157 N.J. at 172-73. "[W]hether a parent's conduct is negligent or grossly negligent requires an evaluation of the totality of the circumstances." E.D.-O., 223 N.J. at 170. In undertaking this analysis, our Supreme Court has warned that we "must avoid resort to categorical conclusions." Id. at 180. Thus, whether a parent failed to exercise a minimum degree of care involves a "fact-sensitive" analysis "and must be resolved on a case-by-case basis." Id. at 192.

Moreover, parents are required to ensure their children either regularly attend the public schools of the district in which they reside or receive

instruction equivalent to that provided in the public schools. N.J.S.A. 18A:38-25; see also Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 641 (2003) (holding attendance of a school-age child is compulsory). A parent who fails to comply with the attendance requirements "shall be deemed to be a disorderly person . . . ." N.J.S.A. 18A:38-31.

To prove abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(a), the Division must establish by a preponderance of the evidence that the harm or imminent risk of harm to a child is the result of a parent's reckless disregard for the child's safety or wellbeing. N.J. Div. of Child Prot. & Perm. v. S.D., 453 N.J. Super. 511, 518 (App. Div. 2018) (citing N.J. Div. of Child Prot. & Perm. v. A. B., 231 N.J. 354, 369 (2017)). Our Supreme Court has linked truancy to child neglect in finding "'[t]he reference to education contained in N.J.S.A. 9:6-8.21(c)(4)(a) concerns parental encouragement to truancy of a school age child, or other interference with normal educative processes.'" Id. at 518-19 (quoting Doe v. G.D., 146 N.J. Super. 419, 431 (App. Div. 1976)), aff'd sub nom., Doe v. Downey, 74 N.J. 196, 199 (1977); N.J. Div. of Youth & Fam. Servs. v. M.W., 398 N.J. Super. 266, 285-86 (App. Div. 2008) (noting a parent had harmed her children through educational neglect, among other forms of abuse, because she had left them with her cousin who locked them in a basement for an extended

period of time and deprived them of beds, food, a toilet, and the physical ability to attend school).

## III.

With these legal principles in view, we turn to the arguments raised on appeal. J.R., M.M., and the Law Guardian challenge the trial court's legal conclusions that "similar to Title [Eighteen], Title [Nine] falls into the realm of [s]trict [l]iability." They contend the court's determination that L.M. missing one hundred days of school was per se Title Nine educational neglect was error. They also posit the finding was made without consideration of the totality of the circumstances, including the potential risk to L.M. of the vaccines and the difficulties brought about by the parents' language barrier.

Our Supreme Court has held Title Nine "is not a strict liability statute." N.J. Div. of Child Prot. & Perm. v. Y.N., 220 N.J. 165, 181 (2014) (citing N.J.S.A. 9:6-8.2(c)(4)(b)) (abuse or neglect cannot be premised solely on harm to a child without the consideration of the reasonableness of the parent's conduct). The Court noted the Legislature had "pointedly included [that standard of care] as a prerequisite to a finding." Ibid.

More recently, our Court held in Title Nine cases, "[a]bsent proof of actual impairment, 'the critical focus is on evidence of imminent danger or substantial

A-0217-23

risk of harm.'" <u>N.J. Div. of Child Prot. & Perm. v. B.P.</u>, 257 N.J. 361, 376 (2024) (quoting <u>N.J. Div. of Youth & Fam. Servs. v. A.L.</u>, 213 N.J. 1, 22 (2013)). The danger to a child must be imminent, and "the mere possibility of the child being impaired is [in]sufficient." <u>B.P.</u>, at 379. In <u>B.P.</u>, the mother of a newborn left her infant in the hospital after providing evasive information to the Division, despite having indicated an intent to care for her child. <u>Id.</u> at 366-67. The Court, in overturning our affirmance of the trial court's finding that this conduct violated Title Nine, noted "these facts might not present an ideal scenario for a newborn child, [but] they do not prove that [the child] was abused or neglected as defined in the statute." <u>Id.</u> at 380.

L.M.'s education is compulsory. <u>See</u> N.J.S.A. 18A:38-25. That does not automatically mean that L.M.'s extended period of absence must lead to a finding of Title Nine neglect. The dispositive question is whether L.M.'s missing school, considering the family's particularized circumstances, constituted educational neglect under the law. We note the trial court expressed its sympathy for L.M.'s medical condition. However, the court did not conduct a sufficient inquiry to determine: whether that situation impacted the reasonableness of her absences; why it took so long for the family to get the

16

right medical care; what assistance was given to the family; and whether the totality of the circumstances constituted abuse and neglect.

We therefore vacate the August 7, 2023 order and remand to the trial court to conduct the required analysis within sixty days of the date of this opinion. We express no opinion as to the merits of the case.

Vacated and remanded for proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0217-23