# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1097-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.P.,

     Defendant-Appellant,

and

J.L.,

     Defendant.

_____

IN THE MATTER OF N.L., a
Minor.

_____

     Submitted January 5, 2021 – Decided March 17, 2021

     Before Judges Moynihan and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FN-21-0143-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasy, Deputy Public Defender, of counsel; Jennifer M. Kurtz, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Alexandra N. Vadala, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Dana Citron, Designated Counsel, on the brief).

PER CURIAM

After a fact-finding hearing, the trial court issued an order concluding that M.P. (Michelle)[1] had abused or neglected her newborn daughter N.L. (Nina) under N.J.S.A. 9:6-8.21(c). Michelle appeals that order. Although the judge erred in finding Michelle had failed to obtain baby supplies, we find other credible evidence in the record sufficient to support the judge's decision and affirm.

---

[1] We use fictitious names for ease of reading and to protect the identities of the parties. R. 1:38-3(d)(12).

Pennsylvania Child Protective Services (PCPS) advised the New Jersey Division of Child Protection and Permanency[2] that the Pennsylvania Child Abuse Hotline had received an email indicating Michelle had been using drugs, including heroin and cocaine, during her pregnancy with Nina, had not received any prenatal care, and had given birth the day before to Nina, who was experiencing withdrawals.

The Division knew Michelle from cases involving her substance abuse during her pregnancies with two other children, K.P. (Kyle), who was born about two years and ten months before Nina, and L.L. (Lisa), who was born about thirteen months before Nina and has the same biological father as Nina, J.L. (Jake).

During her pregnancy with Kyle, the Division received a report from Family Promise[3] that Michelle had tested positive for THC, opiates, benzodiazepines, and synthetic marijuana. She admitted using synthetic marijuana at the beginning of her pregnancy and a week before his birth. Family

---

[2] Nina was born in a Pennsylvania hospital; Michelle identified herself as a New Jersey resident.

[3] Family Promise is an organization whose goal is to provide "sustainable independence for homeless and low-income families." What We Do, Family Promise of Warren County, https://www.wcfamilypromise.org/what-we-do (last visited Mar. 1, 2021).

A-1097-19

Promise removed Michelle from its program due to her noncompliance. Kyle was born premature, at thirty-two-weeks gestation, and weighing three pounds and four ounces. At his birth, Michelle tested positive for methadone, having participated in a methadone program at Stateline Medical Center. Kyle tested negative for drugs but experienced withdrawal symptoms, was admitted to the neonatal intensive care unit, and was administered morphine. A nurse educated Michelle then about methadone withdrawal and how it could affect a child. Michelle's probation officer[4] reported to the Division she had not been compliant with attending substance-abuse treatment when she was first placed on probation. Michelle stopped attending a methadone program at Stateline due to an inability to pay for the treatment. She was referred to a family guidance center but never filled out the pre-registration paperwork. The Division removed Kyle from Michelle's custody when she was found to be under the influence while caring for him. Kyle lives with Michelle's mother in Florida.

When Michelle was about four-months pregnant with Lisa, a social worker met with her in response to a request from the Division for an assessment of whether she presented a risk to Kyle, her parenting skills, and her overall psychological functioning and to make service recommendations if appropriate.

---

[4] Michelle was on probation for possession of synthetic marijuana.

In the interview Michelle denied allegations she was using drugs during that pregnancy but admitted she had used heroin in the past. Michelle acknowledged self-medicating for an anxiety disorder and depression. The social worker noted Michelle had a "history of episodes of [m]ethadone maintenance, as well as relapses with heroin and illegally obtained prescription opiates." Michelle told the social worker the Division required her to attend counseling, obtain stable housing, and participate in an intensive outpatient program. The social worker concluded Michelle required intensive outpatient program services with urine-screen monitoring, long-term aftercare service, and individual psychotherapy.[5] According to the Division caseworker who testified at the fact-finding hearing, Michelle failed to engage in any of those services as requested by the Division.

Lisa was born in South Carolina. South Carolina Department of Social Services investigated Lisa's birth and ongoing concerns about Michelle using drugs. Lisa was removed from the care of Michelle and resides with a resource family in South Carolina. South Carolina authorities reported Michelle was non-compliant with the services offered to her.

---

[5] We note this report was admitted into evidence not as an expert report but for the purpose of eliciting testimony regarding services the Division required of Michelle and for the admission into evidence of any admissions made by Michelle. We limit our consideration of it accordingly.

A-1097-19

While Michelle was pregnant with Nina, the Division received two referrals about Michelle. According to Division records, "[t]he case was opened for services but closed [less than three weeks before Nina's birth] due to [Michelle] refusing further services."

After the contact from PCPS, a Division caseworker went to the hospital to see Michelle and Nina. A nurse advised the caseworker Michelle had tested positive for opiates and methadone three months before Nina's birth and positive for methadone at Nina's birth. The caseworker met with Michelle and Jake in Michelle's hospital room. Michelle told the caseworker she had had prenatal care for six months during her pregnancy but had lost it for unknown reasons. She told the caseworker that for the last five months she had been in a methadone program at Stateline, where she received counseling. She admitted to a history of drug use, including opiates and heroin. She represented that when she found out she was pregnant, she stopped using drugs and started the methadone program. She advised the caseworker she recently had rented an apartment. Jake told the caseworker he "was going to Stateline for detox but he no longer wants to go there anymore." Michelle was discharged later that day.

In the afternoon the caseworker went to the apartment address Michelle had provided. He met two people there: J.P. (Joe) and A.S. (Alice). Michelle

6

A-1097-19

was not present. Joe and Alice appeared to be under the influence of drugs. They were speaking rapidly, sweating profusely, and had a red haze around their eyes. According to the caseworker, Alice previously had lost custody of her children because of her drug use.

Trying to locate Michelle, the caseworker contacted Michelle's husband, who is not Nina's biological father. He told the caseworker Michelle was on her way over to the apartment he shared with his mother to "get the stuff for the baby" and he and Michelle would buy supplies for the baby later that day. He also told the caseworker if Michelle did not have the apartment, she and Nina would live with him. The caseworker went to Michelle's husband's apartment but saw no baby supplies. Michelle's mother-in-law, who was present, confirmed Michelle "has nothing for this baby" and had had no prenatal care.

The caseworker met Michelle at her husband's apartment that evening. Michelle told the caseworker she did not have any baby supplies but expected to obtain the supplies with her husband. She indicated in her husband's presence her husband would be supporting her financially. She conceded she had obtained permission to move into the apartment that day after the caseworker had spoken with Joe, who then asked his mother, the owner of the property, if Michelle could move into the apartment. According to Michelle, she could have

A-1097-19

moved in that day. The caseworker told Michelle he wanted to see the apartment to assess it for safety and appropriateness sometime the next week, giving her time to move her things into the apartment. She admitted she had used heroin intravenously during the initial months of her pregnancy but asserted she had stopped after entering a methadone treatment program four months before Nina was born. She told the caseworker she was not receiving any mental-health treatment and initially denied she had a mental illness but conceded she had been diagnosed with borderline personality disorder. She stated she had attended an initial appointment for prenatal care but was cut-off from subsequent appointments due to an insurance lapse. She asked if the caseworker could help her obtain insurance. He told her he was not able to help her in that way but he provided her with a pamphlet for the Family Success Center,[6] told her he could provide her with additional agency telephone numbers if she wanted to pursue mental-health treatment, and directed her to contact social services to look further into the insurance issue. Michelle's husband represented he would take her to social services to see if they could straighten out her insurance issues.

---

[6] Family Success Centers "are 'one-stop' shops that provide wrap-around resources and supports for families before they find themselves in crisis." Family Success Centers, State of New Jersey Department of Children and Families, https://www.nj.gov/dcf/families/support/success (last visited Mar. 1, 2021).

The caseworker spoke with a staff member of Stateline. Contrary to Michelle's representation that she had not used any drugs outside of the methadone program once she started the program, the Stateline staff member told the caseworker Michelle was non-compliant during much of the program. Michelle had tested positive for other substances, including methamphetamines, cocaine, and opiates. She had missed seven appointments and methadone doses in the last month of her pregnancy even though she had been told again that missing a methadone dose during her pregnancy could be dangerous for the baby. Staff told Michelle about an anticipated insurance lapse that would remove her from the program, but Michelle had done nothing to address the insurance issue and faced discharge from the program.

A staff member of the medical office where Michelle had attended one prenatal appointment denied Michelle had been told her insurance would lapse after the first appointment. Instead, Michelle was given several additional appointments she could have attended before her insurance would lapse. She just didn't attend them.

The caseworker saw Nina in the hospital's neonatal intensive-care unit. Nina was born one-month premature, weighing 4 pounds and 6.6 ounces. She was admitted to the unit with "respiratory distress," specifically persistent rapid

9

breathing, "feeding difficulties," "concerns for opiate withdrawal," and increased Neonatal Abstinence Syndrome[7] scores. The rapid breathing was a sign of withdrawal. The caseworker saw she had a nasogastric feeding tube and that her arms were outstretched with shaking hands, a sign of withdrawal. A nurse told the caseworker Nina was experiencing mild withdrawal symptoms and did not need morphine treatment. Hospital records showed that Nina's urine tests were negative for substances except for methadone. Nina's discharge summary identified as a "fetal complication" a "concern for methadone withdrawal."

After several unsuccessful attempts by the caseworker to arrange with Michelle[8] a time he could see the apartment and baby supplies, the caseworker contacted Joe. According to Joe, Michelle had been given permission to live in the apartment and had moved some baby items into the apartment but was not there currently. Later that day, Michelle told the caseworker he could meet Joe

---

[7] "Neonatal abstinence syndrome is defined as '[a]ny of the adverse consequences in the newborn of exposure to addictive or dangerous intoxicants during fetal development.'" N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 170 n.5 (2014) (quoting Taber's Cyclopedic Med. Dictionary, 1158 (Donald Venes et al. eds., 22d ed. 2013)).

[8] Michelle was unavailable in part because she had to appear in court for sentencing on a possession-of-synthetic-marijuana charge.

A-1097-19

at the apartment the following day for an inspection. The caseworker asked Michelle to be present so he could speak to her and see the apartment and baby items. She agreed to be present.

The next day, when the caseworker arrived, only Joe and Alice were present; Michelle was not. Joe took the caseworker to the rear apartment. Even though the caseworker had told Michelle he wanted to see the apartment to assess it for safety and appropriateness and even though she had had twelve days from when she told the caseworker she could move into the apartment, the caseworker found the apartment to be "in disarray." The kitchen floor was "covered with dirt, garbage, and what appeared to be sleeping bags." When the caseworker asked Joe where the bedroom was, Joe told him a small area he called the "living space" would be used as the bedroom. The carpet in that area was "very dirty" with "deep dark stains all over it" and "several wires" on it. The living space was furnished with a seat from a vehicle and three "very dirty" couches with missing cushions. Joe told him that he would remove two couches and a mattress and box spring, which were on the grass by the entrance of the apartment. The bathroom was "dirty"; the bathtub was filled with shoes. Joe did not grant the caseworker access to another room, which appeared to be "extremely cluttered," because Joe used the room for storage. Joe also used a

A-1097-19

hall closet to store his "airsoft equipment." The caseworker did not see any bed or baby items, other than a bassinet Michelle's husband had purchased.

As the caseworker walked to the front of the residence, he saw a vehicle pull up and witnessed Michelle and Alice unpacking several items from it. Michelle apologized for being late, explaining that the cab had taken time. She showed the caseworker that she had with her packages of diapers, packages of baby wipes, a breast pump, some pacifiers, nail clippers, several baby outfits, and some other items. She told the caseworker she did not have any formula because hospital staff had told her not to buy formula yet, she had a car seat for Nina in her husband's truck, she would be getting a bed, and the couches and mattress would be removed. The caseworker told her the apartment would have to be cleaned if she and Nina moved into it. Michelle represented she would clean and set up the apartment before Nina was discharged. She explained her arrangement with Joe's mother about renting the apartment. She again represented to the caseworker her husband was supporting her financially and would support her until she obtained employment.

They discussed Michelle's substance abuse, her discharge from the methadone program due to insurance issues and an outstanding payment, and her request for Division assistance in finding another substance-abuse program.

12

Contrary to her prior assertion that she had not taken other drugs once she entered the methadone program, Michelle admitted that while she was pregnant with Nina and enrolled in the methadone program, she had tested positive for cocaine and had taken an unprescribed Xanax and later a Roxicodone to stop her and the baby from having withdrawal symptoms when she had missed an appointment at the program. She felt the baby experiencing withdrawal in utero: "I was scared that I was going to kill her . . . from the withdrawal . . . I could literally feel her spazzing out in my stomach and shaking from withdrawing so bad." Instead of going to the emergency room or seeking medical assistance, she self-administered Roxicodone.

Later that day the Division filed a complaint seeking custody of Nina, asserting she had been "abused and/or neglected" in that her condition was impaired or was in "imminent danger" of becoming impaired as a result of her parents' failure to "exercise a minimum degree of care" in (1) "supplying [Nina] with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so"; or (2) "providing [Nina] with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk hereof"; or (3) "by any other acts of a similarly serious nature requiring aid of

13

the court." After a hearing, the court issued an order to show cause, granting the Division temporary custody of Nina. Eleven days later, Nina was released from the hospital to the care of a resource family.

A fact-finding hearing was held focusing on Michelle.[9] The Division presented two witnesses: its investigative case worker and the current caseworker. The judge found them to be credible, especially the former, who testified the Division had sought custody of Nina due to concerns about substance abuse during each of Michelle's pregnancies, lack of stable housing, not being in a drug program, and domestic violence between Michelle and Jake. Michelle did not testify or present any witnesses.

After the hearing, the judge rendered an oral opinion in which she concluded the Division had proven "an imminent risk of harm" pursuant to N.J.S.A. 9:6-8.21(c)(4)(b) to Nina because "there was neglect here not preparing for the birth of the child." The judge acknowledged that if the case were based solely on Nina's withdrawal from methadone, she would find the Division had not met its burden of proof. The judge believed there was more to this case

---

[9] The caseworker tried to reach Jake directly and through Michelle, but he never responded. Michelle faults the Division for not making more effort to contact Jake and for not prosecuting him. That the Division does not prosecute one parent does not excuse the other parent from abusing or neglecting their child.

based on "allegations that this [m]other was entirely unprepared for the birth of her child." The judge cited as "most important" that "there was not a single baby item, no crib, no diapers, no wipes, absolutely no preparation." Finding Michelle had "a long-time history of drug abuse," the judge also relied on Michelle's "inconsistent drug treatment" and her admissions that during her pregnancy she had taken the opiate Roxicodone, unprescribed Xanax, and synthetic marijuana and had tested positive for cocaine. The judge also determined Michelle was not receiving mental health treatment for her borderline personality disorder, "not attending to her substance abuse, [and] not attending to the housing needs that she should have anticipated giving birth to a child." The judge issued an order, finding the Division had established Michelle had "abused or neglected" Nina pursuant to N.J.S.A. 9:6-8.21(c) "relative to environmental neglect due to lack of housing and preparation for the child as well as inattention to [Michelle's] substance abuse treatment and mental health."

On appeal, Michelle argues the judge "misinterpreted and misapplied" N.J.S.A. 9:6-8.21(c)(4) and caselaw and made findings unsupported by the record. Michelle contends Nina was never in her custody and so was never in "imminent danger" or at "substantial risk" of harm from her as required to be proved under N.J.S.A. 9:6-8.21(c)(4)(B). She faults the judge for not identifying

what the danger or harm was contrary to <u>Rule</u> 1:7-4 and for relying improperly on Michelle's past drug use. Michelle argues the judge erred in finding environmental neglect because she incorrectly found that Michelle had not obtained baby supplies, any inability to obtain housing or supplies before Nina's premature birth did not constitute gross negligence or recklessness, and the Division failed to prove Michelle had the financial ability to provide housing and supplies. Finally, Michelle contends the judge did not have to find abuse and neglect and faults her for making that finding because its consequences "will follow [Michelle] for the rest of her life."

In response, the Division argues the judge's finding of neglect was "amply supported by substantial credible evidence" and that under the "totality of the circumstances," Michelle "failed to provide a minimum degree of care to Nina placing her at imminent risk of harm."

At the conclusion of the fact-finding hearing, Nina's law guardian argued that the judge should find neglect. She faulted Michelle for her "significant non-compliance" with the methadone program, for having "no appropriate place for [Nina] to come home to," and for not engaging in services to address her

16

"significant substance abuse issue." On appeal, the law guardian[10] reverses her position and argues that instead of finding neglect under Title Nine, the judge should have found under Title Thirty that Michelle needed the Division's services and assistance.

The Legislature's intent in enacting Title Nine was "to assure that the lives of innocent children are immediately safeguarded." N.J.S.A. 9:6-8.8. In deciding Title Nine cases, courts must be mindful that the "safety of the children" is the paramount concern and the "best interests of the child shall be a primary consideration." Ibid. "The focus in abuse and neglect matters, thus, is on promptly protecting a child who has suffered harm or faces imminent danger." N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013). In determining whether a child has been abused or neglected, a court must consider "the totality of the circumstances." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

N.J.S.A. 9:6-8.21(c)(4) defines an "abused or neglected child" as one

> whose physical, mental, or emotional condition has
> been impaired or is in imminent danger of becoming
> impaired as the result of the failure of [a] parent . . . to
> exercise a minimum degree of care (a) in supplying the
> child with adequate food, clothing, shelter . . . though

---

[10] The attorneys who submitted the appellate brief on behalf of the law guardian did not participate in the fact-finding hearing.

17

A-1097-19

> financially able to do so; or (b) in providing the child
> with proper supervision . . . by unreasonably inflicting
> or allowing to be inflicted harm, or substantial risk
> thereof . . .

By the express wording of the statute, a child who has not yet been impaired but is in imminent danger of being impaired may be an "abused or neglected child" under the statute. A.L., 213 N.J. at 23 (determining that "a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm"). A court "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

Title Nine encompasses a variety of ways in which a child may be deemed to be abused or neglected. Y.N., 220 N.J. at 179. Harm does not by itself establish abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b). Id. at 181. The Division also must prove that in causing the harm, the parent "acted with gross negligence or recklessness," not mere negligence. Ibid. "[A] parent fails to exercise a minimum degree of care where a parent knows of the dangers inherent to a particular situation." V.T., 423 N.J. Super. at 329. "[W]here a parent . . . acts in a grossly negligent or reckless manner, that deviation from the standard of care may support an inference that the child is subject to future danger." N.J.

18

Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 307 (2011).

Our role is limited. We defer to a family judge's factual findings when supported by substantial, credible evidence in the record because the judge "has the superior ability to gauge the credibility of the witnesses who testify" and has "special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "We recognize that the cold record, which we review, can never adequately convey the actual happenings in a courtroom." Ibid. We review de novo a judge's legal conclusions, including whether a parent was grossly negligent. T.B., 207 N.J. at 308.

At the fact-finding hearing, Division counsel asked the caseworker to describe the condition of the apartment when he inspected it. Michelle's counsel did not cross-examine the caseworker about the supplies Michelle had with her when she arrived after the caseworker had completed his inspection of the apartment. He also did not argue in his closing argument that she had obtained any baby supplies. Based on the testimony and arguments presented during the hearing, the judge understandably concluded Michelle had not obtained any baby supplies.

The caseworker's investigative report was admitted into evidence. In one paragraph of that twenty-five-page report, the caseworker described the supplies Michelle delivered to the apartment after his inspection. Although Michelle now relies on that documentary evidence on appeal, she said nothing about it at trial. In spite of the omission, we consider the information contained in the caseworker's written report because it was in evidence and conclude the judge's finding that Michelle had not obtained any baby supplies was incorrect.

Even taking into consideration that Michelle obtained some baby supplies, after careful review we are satisfied the remaining evidence fully supports the judge's conclusion that Nina was abused or neglected within the meaning of N.J.S.A. 9:6-8.21(c)(4) by not preparing for her birth in a multitude of ways and that her conduct rose to the level of gross negligence or recklessness.

Although it is true Michelle had acquired diapers and baby wipes, it is equally true that the housing Michelle had obtained established she was grossly negligent or reckless in failing to prepare for Nina's birth. The deplorable condition of the apartment and its unsuitability for a newborn just released from the neonatal intensive care unit is undisputed. The apartment was "in disarray"; the kitchen floor was "covered" in dirt and garbage; the living/bedroom area had carpeting that was "very dirty" with "several wires" on it; the bathroom was

20

"dirty" with a shoe-filled bathtub; and another room and closet were utilized by an apparent drug user to store his airsoft equipment and other supplies.

Those observations were not made during a rushed, surprise visit. Michelle knew when the caseworker would be at the apartment; she chose the inspection date. She knew why he would be there; he had expressly told her that he wanted to see the apartment to assess it for safety and appropriateness. She had time to get the apartment ready; he inspected the apartment twelve days after she had access to the apartment. The judge reasonably concluded that Michelle's proffer of this apartment as adequate housing for Nina demonstrated that Nina was in "imminent danger of becoming impaired as the result of the failure" of Michelle "to exercise a minimum degree of care," N.J.S.A. 9:6-8.21(c)(4).

Michelle argues the judge did not require the Division to prove Michelle had the financial ability to provide for Nina, citing N.J.S.A. 9:6-8.21(c)(4)(a). In making that argument, Michelle ignores the full language of the statute and the representations she and her husband made to the caseworker. The Division can establish abuse and neglect by a parent's failure to supply adequate shelter "though financially able to do so or though offered financial or other reasonable means to do so." N.J.S.A. 9:6-8.21(c)(4)(a) (emphasis added). Michelle and her husband repeatedly represented he would support her financially.

The judge based her decision not on Michelle's past drug use but on her failure to take steps to address her long-standing addiction issues so that she would be prepared for Nina's birth and able to care for her. The record contains more than just one positive drug test result or a single admission of drug use. See, e.g., A.L., 213 N.J. at 27-28; N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 470 (App. Div. 2014). The record is replete with evidence, including her admissions, of Michelle's intractable drug addiction. The "societal concern that no child come under the care of an intoxicated parent . . . is more pressing [when] the child is an infant." R.W., 438 N.J. Super. at 469. Like the mother in Y.N., 220 N.J. at 170, Michelle was in a methadone program. Unlike the mother in Y.N., ibid., she was not compliant with the program, admittedly using and testing positive for other drugs while she was in the program and missing numerous appointments, even though she had been told that missing a methadone dose could be dangerous for the baby. The judge properly focused on "the risk of substantial, imminent harm to the child, not on the past use of drugs alone." A.L., 213 N.J. at 23.

The judge also determined Michelle had known since her pregnancy with Lisa that she needed individual therapy to address mental-health issues but had not complied with the services recommended for those issues. Michelle

A-1097-19

admitted to being diagnosed with a borderline personality disorder and to self-medicating for an anxiety disorder and depression. Having declined to participate in mental-health services, Michelle self-medicated while pregnant with Nina by taking unprescribed Xanax, cocaine, Roxicodone, and synthetic marijuana. The judge correctly concluded that evidence regarding Michelle's mental-health disorders and her refusal to engage in treatment for those disorders supported a finding of "an imminent risk of harm to the child" and "neglect here [in] not preparing for the birth of a child."

We recognize, as we did in V.T., that "[a]ddiction is not easy to successfully remediate; a failure to successfully defeat drug addiction does not automatically equate to child abuse or neglect." 423 N.J. Super. at 331. We acknowledge that similar challenges face those suffering from mental illness. But, here, Michelle's extensive history of drug abuse and mental illness; multiple failures to seek treatment or to comply with substance-abuse programs; and willingness to take actions she knew to be dangerous while she was pregnant lead us to agree with the trial court that Michelle's failure to prepare for Nina's birth by not addressing her substance-abuse and mental-health issues was grossly negligent and reckless and placed Nina in substantial risk of imminent harm.

Michelle argues that because she never had custody of Nina, she could not have abused or neglected her. In making that argument, she disregards the express language of the statute that encompasses a child in "imminent danger of becoming impaired," N.J.S.A. 9:6-8.21(c)(4), and case law establishing that "[c]ourts need not wait until harm occurs before interceding to protect children." R.W., 438 N.J. Super. at 471. Michelle represented she would be Nina's primary caregiver when she was discharged. That the Division sought and obtained custody of Nina prior to her hospital discharge does not preclude a finding that Michelle's conduct created an imminent risk of harm to Nina.

Michelle and the law guardian argue on appeal an abuse-or-neglect judgment was "not necessary" and the judge instead could have taken other actions under Title 30, including ordering services. In making that argument, they ignore Michelle's repeated rejection of and refusal to participate in the multitude of services offered to her. Given that history, the judge had no reason to believe the provision of services, despite the Division's best efforts, would have protected Nina. The judge was appropriately mindful that the Legislature's "primary concern" in enacting Title Nine was the "safety of the children." N.J.S.A. 9:6-8.8.

Viewing the totality of the circumstances – "not receiving [mental-health] treatment, not attending to her substance abuse, not attending to the housing needs that she should have anticipated giving birth to a child" – the judge correctly found the Division had proved that Michelle had neglected Nina within the meaning of N.J.S.A. 9:6-8.21(c)(4).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION