SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

### New Jersey Division of Child Protection and Permanency v. B.P.
#### (A-56-22) (087676)

**Argued January 4, 2024 -- Decided May 21, 2024**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the New Jersey Division of Child Protection and Permanency (Division) met its burden of establishing by a preponderance of the evidence that a mother abused or neglected her newborn child.

After B.P. (Beth) gave birth to M.S. (Mia) in June 2020, the hospital contacted the Division because both mother and child tested positive for marijuana. Beth expressed to the Division caseworker that she would cooperate with the Division and engage in the offered services. Beth was discharged from the hospital two days after delivering, but Mia remained in the hospital. Beth never returned to the hospital, and the Division was unable to contact or locate her because Beth provided the Division with incorrect contact information. Mia stayed in the hospital two days longer than she would have if Beth returned to take custody of her. Hospital workers clothed, fed, and cared for Mia. The Division caseworker testified that Mia was healthy and her needs were met during that time.

The Division took custody of Mia and placed her in a resource home. The Division filed an action against Beth, arguing that she abused and neglected Mia because she failed to exercise a minimum degree of care in supplying Mia with food, clothing, and shelter pursuant to N.J.S.A. 9:6-8.21(c)(4)(a). Beth appeared for the proceedings, and the trial court concluded that the Division met its burden in proving that Beth abused and neglected Mia. The Appellate Division affirmed.

The Court granted certification. 254 N.J. 512 (2023).

**HELD:** Although Beth left the hospital and did not return, Beth left Mia in a hospital where she was undoubtedly well taken care of and her needs were met. Nothing in the facts suggest that Beth's actions impaired Mia or put Mia in imminent danger of being impaired while she remained in the safety of the hospital's care. The Division therefore failed to meet its burden of establishing abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c)(4)(a).

1

1.  Title Nine governs acts of abuse and neglect against a child.  Its paramount concern is the safety of the children and not the culpability of parental conduct.  The Division has the burden of proving by a preponderance of the evidence that a parent abused or neglected a child, and strict adherence to the statutory standards of N.J.S.A. 9:6-8.21(c)(4) is important.  (pp. 16-17)

2.  To substantiate an abuse or neglect finding under N.J.S.A. 9:6-8.21(c)(4)(a), as relevant here, the Division must prove that a child's "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired" due to the parent's failure to "exercise a minimum degree of care . . . in supplying the child with adequate food, clothing, shelter, education, medical or surgical care."  Absent proof of the child's actual impairment, the critical focus is on evidence of imminent danger or substantial risk of harm.  "Imminent" means threatening to occur immediately, dangerously impending, or about to take place.  Whether the parent failed to exercise a minimum degree of care means that a parent's conduct must be grossly negligent or reckless when analyzed in light of the dangers and risks associated with the situation.  (pp. 17-21)

3.  The facts here do not provide a sufficient basis for a finding that Beth abused or neglected Mia within the meaning of N.J.S.A. 9:6-8.21(c)(4)(a) by putting her in <u>imminent</u> danger of being impaired due to lack of food, clothing, shelter, or medical care.  Beth left Mia at a hospital -- one of the safest places for a newborn child to be.  There is no question that Mia would be (and was) provided with food, clothing, shelter, and medical care if needed while in the hospital.  Beth's conduct of leaving Mia at the hospital was not grossly negligent or reckless.  (pp. 21-23)

4. The Division argues that Beth placed Mia in imminent danger of being impaired because <u>if</u> Mia needed medical care for which a parent's permission was necessary, Beth would not have been able to be located.  But N.J.S.A. 9:6-8.21(c)(4)(a) requires a finding that the child's "condition <u>has been</u> impaired or <u>is</u> in imminent danger of becoming impaired." (emphases added).  And it is unlikely that the Legislature would have chosen the word "imminent" to describe an outside possibility of a child becoming impaired.  Further, it is highly implausible that in an emergency, the hospital would not provide necessary care to a child.  Mia was well cared for and all her needs were met in the hospital.  The Court does not reach the arguments regarding the Safe Haven Infant Protection Act in light of its holding that the Division failed to meet its burden of proving abuse or neglect.  (pp. 23-25)

**REVERSED and the finding of abuse and neglect is VACATED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE PIERRE-LOUIS's opinion.**

2

New Jersey Division
of Child Protection
and Permanency,

Plaintiff-Respondent,

v.

B.P.,

Defendant-Appellant,

and

L.K.S.,

Defendant.

In the Matter of M.S.,

a Minor-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| January 4, 2024 | May 21, 2024 |

T. Gary Mitchell, Deputy Public Defender, argued the
cause for appellant B.P. (Joseph E. Krakora, Public
Defender, Office of Parental Representation, attorney;
T. Gary Mitchell, of counsel and on the briefs).

Christina Duclos, Deputy Attorney General, argued the cause for respondent New Jersey Division of Child Protection and Permanency (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa and Sara M. Gregory, Assistant Attorneys General, of counsel, and Christina Duclos and Nicholas Dolinsky, Deputy Attorney General, on the briefs).

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minor M.S. (Joseph E. Krakora, Public Defender, Office of the Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel, and Julie E. Goldstein and Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the briefs).

Mary M. McManus-Smith argued the cause for amicus curiae Legal Services of New Jersey (Legal Services of New Jersey, attorneys; Mary M. McManus-Smith, Dawn K. Miller, Sylvia L. Thomas, Chiori Kaneko, Jonnelle Casey, and Anne Gowen, on the brief).

Molly K.C. Linhorst argued the cause for amici curiae American Civil Liberties Union of New Jersey and Pregnancy Justice (American Civil Liberties Union of New Jersey Foundation, attorneys; Molly K.C. Linhorst, Karen Thompson, Alexander Shalom, and Jeanne LoCicero, on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this case, we are asked to determine whether the New Jersey Division of Child Protection and Permanency (Division) met its burden of establishing by a preponderance of the evidence that a mother abused or neglected her newborn child. After B.P. (Beth) gave birth to M.S. (Mia), the hospital

2

contacted the Division because both mother and child tested positive for marijuana.[1]  Beth expressed to the Division caseworker that she would cooperate with the Division and engage in the offered services.  Beth was discharged from the hospital two days after delivering, but Mia remained in the hospital.  Beth never returned to the hospital, and the Division was unable to contact or locate her because Beth provided the Division with incorrect phone numbers and a nonexistent home address.

The Division took custody of Mia and placed her in a resource home. The Division subsequently filed an abuse or neglect action against Beth arguing that Beth abused and neglected Mia because she failed to exercise a minimum degree of care in supplying Mia with food, clothing, and shelter pursuant to N.J.S.A. 9:6-8.21(c)(4).  Beth appeared for the proceedings and argued that the Division did not establish the elements required for an abuse or neglect finding.  The trial court concluded that the Division met its burden in proving that Beth abused and neglected Mia.  The Appellate Division affirmed.

We now reverse.  Pursuant to N.J.S.A. 9:6-8.21(c)(4)(a), in order to substantiate an abuse or neglect finding, the Division must prove that a child's "physical, mental, or emotional condition has been impaired or is in imminent

---

[1]  In accordance with Rule 1:38-3(d)(12), and to protect the privacy of the family at issue in this appeal, we refer to the individuals involved by initials and pseudonyms.

3

danger of becoming impaired" due to the parent's failure to "exercise a minimum degree of care . . . in supplying the child with adequate food, clothing, shelter, education, medical or surgical care."  Although Beth left the hospital and did not return, Beth left Mia in a hospital where she was undoubtedly well taken care of and her needs were met.  Nothing in the facts suggest that Beth's actions impaired Mia or put Mia in imminent danger of being impaired while she remained in the safety of the hospital's care.

I.

A.

Beth gave birth to Mia at Newark Beth Israel Medical Center on June 21, 2020.  The next day, the hospital referred Beth and Mia to the Division after they both tested positive for marijuana.  In an interview with a hospital social worker conducted shortly after Mia's birth, Beth discussed her plan for Mia's pediatric care and professed to have the essentials to care for Mia, including appropriate living arrangements and familial support.  The social worker informed Beth about the positive marijuana tests, the referral to the Division, and that Mia would be held at the hospital pending the Division's investigation.

On June 22, 2020, the Division sent a caseworker to investigate the hospital's referral and interview Beth.  Beth told the caseworker her name had

4

the initials B.A. -- the same name that appeared on Mia's birth records -- but the Division later learned that the name Beth had provided was not her real name, and that Beth's real initials were B.P. Beth also informed the caseworker that Mia's father's name was K.S., but the Division later discovered that although his middle and last initials are K.S., his full name had the initials L.K.S. (Leo). Beth explained that she had a "complicated" relationship with Leo and that they did not live together, but she expected that he would financially provide for her and Mia.

During the interview, Beth admitted to smoking marijuana two weeks before delivering Mia to help with her lack of appetite. She informed the caseworker that she lived with her grandmother M.J. (Martha) at 84 Norwood Avenue in Irvington and was currently unemployed because she had been laid off from her position as a daycare assistant at the start of the COVID-19 pandemic. Beth reported receiving $300 monthly in food stamps and that she had a pending application to the New Jersey Supplemental Nutrition Program for Women Infants and Children.

The caseworker informed Beth that a home assessment was required to determine whether she could adequately provide and care for Mia. Beth expressed willingness to cooperate with the Division, and she agreed to receive services for first-time mothers and substance abuse evaluations from Essex

5

Pregnancy and Parenting Connection. She also consented to the home assessment and requested that the Division contact her, Martha, and Leo before the evaluation. She provided the caseworker with all their contact information.

That same day, the Division caseworker observed Beth and Mia together in the hospital's nursery. The caseworker noted that Beth was attentive and inquisitive, "appeared to be caring properly" for Mia, and that Mia "was safe, healthy, and well taken care of."

The following day, June 23, 2020, the Division caseworker attempted to contact Beth and Martha via the phone numbers Beth provided. Beth's number was not in service and the person who answered the phone that purportedly belonged to Martha told the caseworker she had the wrong number. Further, the Division learned that Leo had a different number than the one Beth provided. When the caseworker called Leo's correct phone number, no one answered.

Later that day, the caseworker called the hospital to discuss the investigation, and a hospital employee handed the phone to Beth. Beth acted confused and surprised that the numbers she provided were incorrect. Beth advised the caseworker that she would call her back. Beth called the caseworker back from a phone number she had not previously provided and agreed to meet the caseworker at her home at 4:00 p.m. that day for the home

6

assessment. Upon arriving at 84 Norwood Avenue in Irvington, however, the caseworker found that there was no residence at the address Beth provided, which the caseworker confirmed after speaking with nearby residents. To ensure she did not mistakenly go to the wrong address, the caseworker also travelled to 84 Norwood Avenue in Newark, where she found a vacant lot. The caseworker attempted to call Beth at the number Beth had called from earlier that day, but no one answered.

Beth was discharged from the hospital on June 23, while Mia remained. The Division lost contact with Beth after June 23. Beth never returned to the hospital to see Mia, nor did she contact the hospital regarding when Mia would be discharged. On June 26, the Division executed an emergency removal of Mia from the hospital and placed her in a non-relative resource home. From June 23 to June 26, 2020, hospital workers clothed, fed, and cared for Mia. The caseworker testified that Mia's needs were met during that time.

### B.

On June 30, 2020, the Division filed a verified complaint and order to show cause for temporary custody of Mia against Beth and Leo. Neither parent was present at the order to show cause hearing conducted that same day. The court granted the Division temporary custody of Mia.

The Division subsequently initiated Title Nine proceedings and substantiated a claim against Beth for abusing or neglecting Mia under N.J.S.A. 9:6-8.21(c)(5), which requires a finding of willful abandonment. The Division concluded that Beth abandoned Mia and lacked an apparent intention to return.[2] The trial court scheduled the fact-finding hearing for November 20, 2020. On November 17, however, the Division advised the court and Beth's counsel via email that it intended to pursue an abuse or neglect charge against Beth under N.J.S.A. 9:6-8.21(c)(4) for failing to exercise a minimum degree of care for Mia, rather than for abandonment under (c)(5). Beth opposed the Division's attempt to change its legal theory, but the court allowed it, finding there was no meaningful difference between the two provisions given the evidence.

The fact-finding hearing occurred on December 3, 2020. Beth appeared with counsel, but neither she nor Mia's Law Guardian proffered any witnesses or evidence. The caseworker assigned to Mia's case testified for the Division. The Division also presented evidence of the hospital records and its investigative report.

---

[2] The Division did not investigate Leo or substantiate any claims against him. Leo, though listed as a defendant, is not involved in this appeal.

During closing arguments, Beth first argued that the Division failed to meet its burden of proving that she abused or neglected Mia under N.J.S.A. 9:6-8.21(c)(4). She contended that "[t]his is not a case of . . . a parent failing to provide for her baby," but was instead the responsible choice of a desperate young mother who left her baby at the hospital where she would receive shelter and care. Second, Beth argued that the New Jersey Safe Haven Infant Protection Act (Safe Haven Act), N.J.S.A. 30:4C-15.5 to -15.11,[3] sheltered her actions from Title Nine liability.

The Division argued that Beth abused and neglected Mia "when she failed to exercise a minimum degree of care by leaving her newborn child in the hospital and failing to provide her newborn baby with any provisions." It further argued that the Safe Haven Act was inapplicable because Beth did not invoke the Act's protections and instead evinced an intent to return and care for Mia. Mia's Law Guardian, supporting the Division, advanced similar arguments.

---

[3] The Legislature enacted the Safe Haven Act in 2000, L. 2000, c. 58. In doing so, the Legislature recognized "that newborn infants are sometimes abandoned in life-threatening situations," and new parents "under severe emotional stress . . . may need a safe haven available to them and their child." N.J.S.A 30:4C-15.6(a) to (b). The Act grants "[a]nonymity, confidentiality and freedom from prosecution" to parents who comply with its requirements as a means of encouraging parents to safely leave an infant at a safe haven location, which includes police stations, fire departments, and hospitals. Id. at (c); N.J.S.A 30:4C-15.7(e).

On December 9, 2020, the trial court issued an oral decision finding that Beth abused or neglected Mia presumably under N.J.S.A. 9:6-8.21(c)(4)(a) and (b) by failing to exercise the minimum degree of care in providing Mia with "adequate food, clothing, and shelter" and by failing to provide her with "proper supervision, care, or a plan by unreasonably putting the child at a further risk of harm." The court emphasized that its ruling regarding risk of harm was unrelated to the positive marijuana tests. The court rejected Beth's argument that Mia was not at risk of harm because she was receiving adequate care in the hospital, and instead reasoned that Beth unreasonably put Mia at risk of harm by walking away from her without a plan for her care and lying to the Division about her intentions to comply with the home assessment process.

In so ruling, the court explained that Beth could have been truthful to the Division about her intentions and granted it temporary custody of Mia to make important medical and legal decisions. The court explained that Beth's purported desire to care for Mia, coupled with her disappearance, meant that no one was available to make those decisions.

The court also rejected Beth's argument that the Safe Haven Act sheltered her from prosecution. Relying on the statute's text, the court explained that the Safe Haven Act applies only to new parents who do "not express an intent to return for the child." The court reasoned that Beth did not

10

unambiguously state her desire to relinquish Mia, but instead misled the Division into believing she desired to care for Mia by agreeing to cooperate with the home assessment and to receive substance abuse and new mother assistance.

At the conclusion of the proceedings, the parties agreed that Beth, Leo, and Mia's paternal grandmother would share legal custody of Mia, with the paternal grandmother maintaining physical custody. The trial court sanctioned this arrangement.

Beth appealed the trial court's finding of abuse and neglect, and the Appellate Division affirmed. First, the Appellate Division agreed that Beth's "intentional failure to provide an appropriate plan for [Mia's] care and security" constituted abuse or neglect under N.J.S.A. 9:6-8.21(c)(4).[4] The court explained that Beth's actions of "deliberately" providing the Division false information, losing contact, and walking away from Mia cannot "reasonably be classified as inattentive or merely negligent," but instead "caused real harm to [Mia]" because she "remained in the hospital longer than necessary." Second, the Appellate Division concluded that Beth did not

---

[4] The Appellate Division's opinion does not distinguish N.J.S.A. 9:6-8.21(c)(4)(a) from 9:6-8.21(c)(4)(b), nor does it clarify under which of those subsections -- both found satisfied by the trial court -- it affirmed the abuse or neglect finding.

11

invoke the Safe Haven Act because she "clearly 'express[ed] an intent to return' for [Mia]."[5]

We granted Beth's petition for certification. 254 N.J. 512 (2023). We also granted Legal Services of New Jersey (LSNJ) and the American Civil Liberties Union of New Jersey and Pregnancy Justice (jointly, ACLU) leave to appear as amici curiae.

## II.

### A.

Beth asks us to reverse the Appellate Division's decision, arguing that her actions do not constitute abuse or neglect. Beth contends that the Division's abuse or neglect theory contradicts N.J.S.A. 9:6-8.21(c)(4)'s textual requirements because the Division failed to adduce evidence that she put Mia's well-being at imminent risk of impairment by leaving her safe and cared for at the hospital. Rather than basing their findings on evidence of actual or imminent impairment, Beth argues, the Division and courts below punished her because she was untruthful to the Division caseworker. Beth also asserts that the Safe Haven Act shelters her from an abuse or neglect prosecution

---

[5] Beth also argued that the trial court exhibited gender bias against her, which she argues before this Court as well. The Appellate Division rejected this argument because there is no evidence in the record indicating that the trial judge exhibited any bias. We agree and reject that argument as well.

12

because she complied with the Act by walking away from Mia and not expressing an intent to return.

LSNJ supports Beth's positions. It first urges us to adopt a bright-line rule holding that a court cannot make an abuse or neglect finding under any section of N.J.S.A. 9:6-8.21(c) when a parent leaves an infant at a safe haven location and does not return. Second, LSNJ argues that to properly invoke the Safe Haven Act's protections, a new parent need not "affirmatively state, verbally, an intention to relinquish their infant," but must merely leave the child at a safe haven location and not express or demonstrate an intent to return.

The ACLU, jointly with Pregnancy Justice, also urges this Court to reverse the Appellate Division's decision, arguing that Beth did not abuse Mia under N.J.S.A. 9:6-8.21(c)(4) because Mia was neither impaired nor in imminent danger of becoming impaired when she remained in the hospital. The ACLU contends that Beth properly invoked the Safe Haven Act because she did not express an intent to return for Mia, and any statements indicating her desire to care for Mia comport with the Division's stance on allowing parents to reunite with their children even after invoking the Safe Haven Act.

B.

The Division asks us to affirm the Appellate Division's decision and argues that Beth abused or neglected Mia under N.J.S.A. 9:6-8.21(c)(4)[6] when she "provided false information and did not return to care for her child." The Division contends that Beth's actions "resulted in Mia remaining hospitalized longer than necessary, deprived Mia of any parental care or nurture, and ultimately required the Division to intervene and place Mia with a non-relative resource home." According to the Division, those realities demonstrate that Beth placed Mia at a substantial risk of harm because no one was available to make medical or legal decisions for her, and therefore, Beth's "intentional failure to provide an appropriate plan for Mia's care and security" suffices as abuse or neglect under N.J.S.A. 9:6-8.21(c)(4). The Division further maintains that Beth did not invoke the Safe Haven Act because she "unambiguously did express an intent to return and to care for Mia on multiple occasions."

Finally, Mia's Law Guardian asks us to affirm, echoing the Division's arguments. The Law Guardian concedes that Mia "did not experience harm because of lacking food, shelter or medical care" but nonetheless maintains that Beth is liable under N.J.S.A. 9:6-8.21(c)(4) because her actions kept Mia

---

[6] The Division confirmed during oral argument that it relies solely on N.J.S.A. 9:6-8.21(c)(4)(a) and not subsection (b), notwithstanding the fact that the trial court appeared to find both subsections applied to Beth's conduct.

14

"in limbo" and delayed her permanent placement, subjecting her to possible harm.

III.

A.

Appellate courts defer to a trial court's factual findings when they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). "Because of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court factfinding." Id. at 413. Therefore, "[w]e will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." DYFS v. F.M., 211 N.J. 420, 448 (2012) (quoting DYFS v. E.P., 196 N.J. 88, 104 (2008)). The family court's legal conclusions, however, are reviewed de novo. DCPP v. A.B., 231 N.J. 354, 369 (2017).

This appeal requires us to interpret N.J.S.A. 9:6-8.21(c)(4), a task of statutory interpretation that we conduct de novo, without according deference to the trial court's analysis. Kocanowski v. Township of Bridgewater, 237 N.J. 3, 9 (2019). Our role when interpreting a statute "is to determine and give effect to the Legislature's intent." DYFS v. A.L., 213 N.J. 1, 20 (2013).

To achieve that goal, "we look first to the plain language of the statute," ibid., attributing to statutory words "their ordinary meaning and significance and read[ing] them in context with related provisions so as to give sense to the legislation as a whole," DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citations omitted). If the statutory text has a clear meaning, that meaning controls, but if the plain language is ambiguous or leads "to an absurd result or to a result at odds with the objective of the overall legislative scheme," then we will analyze extrinsic sources such as legislative history to best determine legislative intent. DCPP v. Y.N., 220 N.J. 165, 178 (2014).

B.

Title Nine "governs acts of abuse and neglect against a child." A.L., 213 N.J. at 18. Its purpose is "to protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'" Ibid. (quoting N.J.S.A. 9:6-8.8(a)). Thus, Title Nine's "'paramount concern' is the 'safety of the children' and 'not the culpability of parental conduct.'" Ibid. (first quoting N.J.S.A. 9:6-8.8(a); and then quoting G.S. v. DYFS, 157 N.J. 161, 177 (1999)).

In Title Nine proceedings, the Division has the burden of proving by a preponderance of competent, material, and relevant evidence that a parent abused or neglected a child. N.J.S.A. 9:6-8.46(b); DCPP v. J.R.-R., 248 N.J.

16

353, 376 (2021). An abuse or neglect adjudication has serious consequences for a parent as it may serve as the basis for terminating parental rights, Y.N., 220 N.J. at 179, and the parent's name is placed on the child abuse registry, N.J.S.A. 9:6-8.11. Employers may access the registry while fulfilling their legal obligation to "consider child abuse or neglect information when conducting a background check or employment-related screening." A.L., 213 N.J. at 26. Therefore, "because the stakes are high for all parties concerned," we have emphasized that "[s]trict adherence to the statutory standards of N.J.S.A. 9:6-8.21(c)(4) is important." Y.N., 220 N.J. at 179; see also A.L., 213 N.J. at 34.

N.J.S.A. 9:6-8.21(c)(4) provides that an "abused or neglected child" is

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [(emphases added).]

17

To sustain an abuse or neglect finding under either subsection (a) or (b), the Division must establish (1) that a child's "physical, mental, or emotional condition <u>has been impaired or is in imminent danger of becoming impaired</u>," <u>ibid.</u> (emphasis added), and (2) the "impairment or imminent impairment results from the <u>parent's failure to exercise a minimum degree of care</u>," <u>A.B.</u>, 231 N.J. at 369 (emphasis added).

Evidence of the child's actual impairment or harm satisfies the first element. <u>A.L.</u>, 213 N.J. at 22. Absent proof of actual impairment, "the critical focus is on evidence of imminent danger or substantial risk of harm." <u>Ibid.</u> In <u>A.L.</u>, for example, we held that a child was neither impaired nor at imminent risk of impairment by virtue of testing positive for cocaine at birth because the child's "health was otherwise normal," and the child was discharged two days after being born. <u>Id.</u> at 9, 27-30.

We did not, however, define the standard for determining when a child's well-being is in "imminent danger" of impairment or harm. Per their plain meanings, "imminent" means "threatening to occur immediately; dangerously impending . . . [or] about to take place," <u>Black's Law Dictionary</u> 898 (11th ed. 2019), and "danger" means "peril; exposure to harm, loss, pain, or other negative result," <u>id.</u> at 493. Further, <u>Black's Law Dictionary</u> defines

18

"imminently dangerous" as "reasonably certain to place life and limb in peril." Id. at 494.

N.J.S.A. 9:6-8.21(c)(4)'s second element, whether the parent failed to exercise a minimum degree of care, "means that a parent's conduct must be 'grossly negligent or reckless'" -- ordinary negligence is insufficient. Y.N., 220 N.J. at 180 (emphasis added) (quoting DCPP v. T.B., 207 N.J. 294, 306 (2011)). A parent's conduct "must 'be analyzed in light of the dangers and risks associated with the situation.'" Id. at 184 (quoting G.S., 157 N.J. at 181-82). That inquiry requires us to "account for the surrounding circumstances" because "[a]buse and neglect cases 'are fact-sensitive.'" A.B., 231 N.J. at 369-70 (quoting DCPP v. E.D.-O., 223 N.J. 166, 180 (2015)). Weighing whether a parent has exercised minimum care requires "consideration of the reasonableness of the parent's conduct." Y.N., 220 N.J. at 181.

In this matter, the Division relies exclusively on subsection (a) of N.J.S.A. 9:6-8.21(c)(4) to substantiate its abuse or neglect finding.

As noted, subsection (a) requires the Division to prove by a preponderance of evidence that a child was impaired or in imminent danger of being impaired by a parent's failure to exercise minimum care "in supplying the child with adequate food, clothing, shelter, education, medical or surgical

19

care though financially able to do so or though offered financial or other reasonable means to do so." N.J.S.A. 9:6-8.21(c)(4)(a).

Applying those elements in A.B., we affirmed an abuse or neglect adjudication under subsection (a) when a mother, A.B., barred her sixteen-year-old daughter and her daughter's infant child from the family home, relegating them to a home without electricity. 231 N.J. at 358-59. We deemed A.B.'s actions "grossly negligent because she was clearly aware of the dangers" her teenage daughter faced, and because she was not providing her daughter with "any parental supervision, guidance, or care." Id. at 370. We agreed with the Appellate Division's conclusion that "the risks inherent in barring a sixteen-year-old child from the family home without arranging any alternative source of shelter or support are obvious." Id. at 371.

Conversely, the Appellate Division reversed an abuse or neglect finding under subsection (a) in DCPP v. L.W. based on an impoverished mother bringing her children to the Division and consenting to placing them in foster care because she could not find housing despite her best efforts. 435 N.J. Super. 189, 191-92 (App. Div. 2014). The trial judge had concluded that the mother neglected "her children due to her 'unbelievably poor planning.'" Id. at 193. In reversing, the Appellate Division reasoned that the mother acted commendably by turning to the Division rather than subjecting her children to

20

homelessness. Id. at 196-97. The appellate court noted that "[i]t is important that impoverished, homeless parents feel free to call on the Division in times of need, without fear of being found neglectful for 'poor planning.'" Id. at 196.

IV.

With that guidance in mind, we turn to the facts of this case. There is no dispute that Beth, just days after giving birth, left her daughter Mia, who was not yet discharged, at the hospital and did not return. Neither the hospital nor the Division was able to contact or locate Beth thereafter. Mia stayed in the hospital two days longer than she would have if Beth had returned to take custody of her. While at the hospital, Mia's needs, including food, clothing, and shelter, were met. Despite testing positive for marijuana at birth, Mia was a healthy child; she did not experience any withdrawal symptoms, and she did not need any emergency medical care while in the hospital prior to the Division taking custody of her and placing her in a resource home.

The Division sought an abuse or neglect finding against Beth pursuant to N.J.S.A. 9:6-8.21(c)(4)(a), which requires the Division to establish by a preponderance of the evidence that a child was impaired or in imminent danger of being impaired by a parent's failure to exercise minimum care "in supplying the child with adequate food, clothing, shelter" or medical care. The Division

21

argues that Beth did not put a plan in place for caring for Mia and "recklessly failed or refused to supply Mia with adequate food, clothing, and shelter under N.J.S.A. 9:6-8.21(c)(4)(a)."

We cannot find that the Division met its burden under the statute. We accept and defer to the facts found by the trial court in this matter. Those facts, however, when applied to a plain reading of N.J.S.A. 9:6-8.21(c)(4)(a), do not provide a sufficient basis for a finding that Beth abused or neglected Mia by putting her in <u>imminent</u> danger of being impaired due to lack of food, clothing, shelter, or medical care. Beth did not carelessly leave Mia alone on a street corner or in an alleyway without food or shelter, putting her at risk. Beth left Mia at a hospital -- one of the safest places for a newborn child to be. There is no question that Mia would be (and was) provided with food, clothing, shelter, and medical care if needed while in the hospital. It is undisputed that Beth provided the Division with incorrect contact information and failed to return to take custody of her child, but those facts are insufficient to substantiate an abuse and neglect finding.

Beth left Mia in a place where she knew the child would be cared for and not in a place of imminent danger or peril to Mia's well-being. As we stated in <u>Y.N.</u>, a parent's conduct "must 'be analyzed in light of the dangers and risks associated with the situation.'" 220 N.J. at 184 (quoting <u>G.S.</u>, 157 N.J. at 181-

22

82). In considering the facts of this case and determining whether Beth exercised minimum care to ensure that Mia would be cared for, Beth's conduct of leaving Mia at the hospital was not "grossly negligent or reckless." See id. at 181.

The Division nevertheless maintains that Beth placed Mia in imminent danger of being impaired because if Mia needed medical care for which a parent's permission was necessary, the hospital and the Division would not have been able to locate Beth to obtain such parental permission. At oral argument, the Division argued at length about the various emergency situations in which a child could be in imminent danger while at a hospital and parental permission would be necessary for the hospital to address the emergency.

But N.J.S.A. 9:6-8.21(c)(4)(a) requires a finding that as a result of the parent's failure to exercise a minimum degree of care, the child's "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired." (emphases added). The statute does not state that the mere possibility of the child being impaired is sufficient. Once again, the word imminent means "threatening to occur immediately; dangerously impending . . . [or] about to take place." Black's Law Dictionary 898 (11th ed. 2019). It is unlikely that the Legislature would have chosen the word "imminent" to describe an outside possibility of a child becoming impaired or

23

the infinite number of scenarios that could transpire. Nothing in the plain reading of the statute suggests that any number of hypotheticals in the circumstance here would suffice to establish that a parent placed a child in imminent danger of impairment.[7]

Furthermore, it is highly implausible that in an emergency or life-threatening situation, the medical staff at a hospital would not provide necessary care to a child already at the hospital but instead attempt to find the parent that had absconded in order to get permission to administer care. In any event, Mia was never in need of such medical care. The Division caseworker even testified that Mia was "healthy, and well taken care of." Although Mia could have potentially needed medical care during that time, the reality is that she did not need such care, so the Division's theory that Mia was in imminent or impending danger of being impaired simply based on a possibility that

---

[7] In its oral opinion, the trial court correctly stated that "in the absence of actual harm, a finding of abuse and neglect can be . . . based on proof of imminent danger and substantial risk of harm." In finding that Beth had abused or neglected Mia, the trial court noted that "[b]y providing . . . false information and not returning for the child, [Beth] failed to exercise the minimum degree of care in supplying the child with . . . adequate food, clothing, and shelter." The court, however, never specifically stated the facts that supported its finding that Mia was in imminent danger of becoming impaired as a result of Beth's failure to exercise a minimum degree of care, as required by the statute. If a court substantiates an abuse or neglect finding based on a parent placing a child in imminent danger of being impaired, the court must make the specific findings of the facts underpinning that determination.

24

something, anything, could have happened is an insufficient basis to substantiate a finding of abuse or neglect.

The Division further argues that Mia was in danger of impairment because she was deprived of parental nurturing and care and because she stayed in the hospital two days later than she otherwise would have. While these facts might not present an ideal scenario for a newborn child, they do not prove that Mia was abused or neglected as defined in the statute. Mia was well cared for and all her needs were met in the hospital.

Although the parties argued at length regarding the applicability of the Safe Haven Act, we see no reason to reach those arguments because we hold that the Division failed to meet its burden of establishing abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c)(4)(a).

V.

For the foregoing reasons, the judgment of the Appellate Division is reversed and the trial court's finding of abuse and neglect is vacated.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE PIERRE-LOUIS's opinion.

25